UNITED STATES of America,
Plaintiff–Appellee,

v.

Collin BUCHANAN,
Defendant–Appellant.

No. 89–3536.

United States Court of Appeals,
Seventh Circuit.

Submitted July 31, 1990.[*]

Decided Aug. 27, 1990.

[*] After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." *See* Fed.R.App. P. 34(a); Circuit Rule 34(f). No such statement having been filed, the appeal is submitted on the briefs and record.

**1572**

Jeffrey Anderson, Asst. U.S. Atty., Madison, Wis., for plaintiff-appellee.

Donald J. Murphy, Madison, Wis., for defendant-appellant.

Before COFFEY and FLAUM, Circuit Judges, and PELL, Senior Circuit Judge.

PELL, Senior Circuit Judge.

In this case we are asked to decide whether police would inevitably have discovered cocaine stored in the appellant's hotel room. The facts of the case are these: on December 6, 1988, Kevin Evans was shot to death with a nine millimeter or .38 caliber handgun in Columbus, Ohio. Three witnesses were available to testify that the appellant in this case, Collin Buchanan, known to the witnesses as "Silver," was the assailant. Immediately after the shooting, Buchanan packed his belongings and took a taxicab from Columbus to Zanesville, Ohio. He told the cab driver that he planned to take an eastbound bus from Zanesville. Columbus police obtained an arrest warrant for Buchanan and filed a wanted person report with the National Crime Information Center. Buchanan already had a record as a felon convicted of drug offenses in the state of New York.

Buchanan came to the attention of the Madison, Wisconsin, police on December 23, 1988. A man named Lorenzo Phillips told police that a man (later identified as Buchanan) had a large amount of crack cocaine and was holding Phillips' girlfriend until she paid $500. Police found Buchanan, but the girl denied that she was being held against her will. A search of Buchanan's car failed to result in the discovery of either drugs or weapons.

On January 4, 1989, police were informed that a man matching Buchanan's description was selling cocaine out of his car in a parking lot, and that the seller wanted to trade cocaine for a nine millimeter handgun. Another tip about Buchanan was received on January 9. On January 11, 1989, Detective Pharo of the Madison police department sent Buchanan's fingerprints to the FBI Identification Office. The FBI identified Buchanan and informed the Madison police of the Ohio murder warrant.

Detective Pharo called the Columbus police to learn more about the warrant and about Buchanan. He was told that Buchanan had shot Evans with a nine millimeter handgun and that the motive for the shooting had been a $200 drug debt. Detective Pharo issued a bulletin about Buchanan to all Madison police on January 12.

In a short time, Buchanan's car was spotted. The police followed him to the West Towne Roadstar Inn, where the desk attendant confirmed that a man answering Buchanan's description was registered in the hotel under the name of Darryl Bailey. Officers took up a position in the room opposite Buchanan's and other officers secured the corridor. Detective Pharo asked the hotel manager to get Buchanan out of the room on a pretext. When Buchanan emerged into the hallway, he was arrested and the self-locking door to the room swung closed. The key to the room was clutched in Buchanan's hand. The police took the key from him and executed a quick sweep of the room to see if there was anyone else there. They found nothing.

Detective Pharo then asked Buchanan what he wanted done with his clothes. He said he would have someone pick them up the next day, but Pharo told him that no one else would be allowed into the room and that police would pack for him. Buchanan did not object to police handling his clothes, but he insisted on watching while they did so. While stuffing Buchanan's clothes into a duffle bag, officers discovered a three-beam scale of the type used in drug deals and small packets containing cocaine. The packing was stopped immediately while a search warrant was obtained. Only then was Buchanan informed of his *Miranda* rights.

The search conducted under the warrant revealed 125 grams of cocaine. As a result, Buchanan was charged with possession of cocaine with intent to distribute. He filed a motion to suppress the evidence seized at the hotel room on grounds that it had been taken in violation of the Fourth Amendment. The magistrate heard evidence and recommended that the motion be denied on grounds that discovery through proper means was inevitable. The evidence was admitted at Buchanan's one-day jury trial, at which he was convicted. It was only after the trial that the district judge received Buchanan's objections to the magistrate's report and recommendation. She ruled that the objections were timely, and that the magistrate had not adequately developed the record on the question of inevitable discovery and remanded for the taking of additional evidence. After a supplemental hearing, the magistrate reached the same conclusion, and further found that Buchanan had freely consented to having the police remove his clothes from the room. This report and recommendation was accepted by the district court, which then sentenced Buchanan to forty-one months in prison. Buchanan filed a timely notice of appeal.

The issue in this appeal is whether the cocaine discovered when Buchanan's clothes were being packed would inevitably have been discovered through a search pursuant to a proper warrant. *Nix v. Williams*, 467 U.S. 431, 443–45, 104 S.Ct. 2501, 2508–10, 81 L.Ed.2d 377 (1984). To answer this question, we must answer two subsidiary questions: first, would the police have inevitably sought a search warrant for the room, and second, would a neutral magistrate have issued such a warrant. Because we answer both those questions in the affirmative, we hold that the motion to suppress evidence was properly denied, and we affirm the conviction.

The first question is an easy one; Buchanan was arrested for murder, and the murder weapon had not yet been found. The defendant was located in a hotel room which he occupied under an assumed name. The magistrate cited Ringel, *Searches and Seizures, Arrests and Confessions* (1988) for the proposition that an application for a warrant to search the room for the gun would have been "proper and predictable police investigatory procedure[ ]." *Id.* at § 3.3(b). Indeed, it would have been foolish not to want to look for the gun there. Buchanan was suspected of drug dealing in addition to murder, and guns are tools of the drug-dealing trade. *United States v. Alvarez*, 860 F.2d 801, 829–30 (7th Cir. 1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1966, 104 L.Ed.2d 434, (1989).

Buchanan's principal argument on appeal is that a neutral magistrate would not have found "a fair probability" that the gun would be found in the hotel room. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Fair probability has been interpreted to mean "that it would be reasonable to seek the evidence in the place indicated in the affidavit." *United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir.) (Kennedy, J.), *cert. denied,* 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985). Buchanan's position is that the police and the magistrate could not reasonably expect a criminal to keep a murder weapon with him for thirty-seven days (the time between the murder of Evans and the search in Madison) or to keep the weapon at his residence. He relies on *United States v. Charest*, 602 F.2d 1015 (1st Cir. 1979) for the proposition that there is no probable cause to believe that a murder weapon will be found in a suspect's home.

In *Charest*, the defendant was named as the killer of Dennis Raimondi sixteen days after Raimondi's murder. The First Circuit wrote:

> Common sense tells us that it is unlikely that a murderer would hide in his own home a gun used to shoot someone. If defendant shot Raimondi, as the affidavit states, one of the first things he would do would be to get rid of the gun. The handgun could easily have been disposed of permanently within a short time after the crime. It is not reasonable to infer that the defendant drove from Somerset to Fall River [Massachusetts] and then casually placed a weapon which had fired

more than one bullet into a man on the shelf in his bedroom closet.

602 F.2d at 1017. The court noted that ballistics is a well-known science. In sum, the *Charest* court held that some nexus had to be shown between the gun and the defendant's home, and that no nexus was established.

We believe that this case is significantly different from *Charest*, and that the differences establish that it would be reasonable to seek the Ohio gun in Buchanan's Wisconsin hotel room despite the passage of time. The principal difference between the cases is that Charest was living openly in a home he had apparently occupied for a long time whereas Buchanan was a fugitive living in temporary quarters under a false name. Anyone looking for Charest knew exactly where to look—he could always be found at his Fall River home. Someone looking for Buchanan would have to have the foresight to ask at the right hotel for Darryl Bailey. Buchanan could reasonably be supposed to have made the gun unavailable by making himself unavailable. And, as the magistrate noted in his second report and recommendation: "One traveling in fugitive status is highly vulnerable and is necessarily constrained in movement and activity. The value of a firearm to such a person cannot be underestimated." Beyond even Buchanan's fugitive status, he was also believed by police to be involved in drug dealing even before any cocaine was found. As we have already noted, guns are tools of the drug merchant's trade. *United States v. Alvarez, supra.*

The fact that Buchanan was believed to be trying to exchange drugs for a gun some days before the arrest and search does not mean that it was unreasonable to suppose that he might still have the original gun. Buchanan was a convicted felon and could not buy a replacement weapon legally. He was a fugitive and may not have had friends in Madison from whom he could get another gun. The attempt to trade drugs for guns could have been an attempt to get another weapon before discarding the murder weapon. There were no reports about whether Buchanan had succeeded in making his swap. Therefore, it was reasonable to believe that a search of Buchanan's hotel room had a fair chance of discovering the gun used in the Ohio murder. The narcotics would inevitably have been found in a search for the gun. Therefore, it was correct to deny Buchanan's motion to suppress that evidence. The conviction is

AFFIRMED.