UNITED STATES of America,
Plaintiff–Appellee,

v.

Stephen M. WILLIS, Defendant–
Appellant.

No. 94–2451.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1995.

Decided July 26, 1995.

Ranley R. Killian, Jr. (argued), Randy G. Massey, Office of U.S. Atty., Criminal Div., Fairview Heights, IL, for plaintiff-appellee.

Daniel R. Schattnik (argued), Unsell, Unsell & Schattnik, East Alton, IL, for defendant-appellant.

Before RIPPLE and ROVNER, Circuit Judges, and MILLER, District Judge.*

RIPPLE, Circuit Judge.

Following a jury trial, Stephen Willis was convicted of one count of unlawful possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1). He was sentenced to seventy-eight months of imprisonment and four years of supervised release. Mr. Willis challenges his conviction on four grounds. For the reasons that follow, we affirm the conviction.

I

BACKGROUND

On December 22, 1993, Trooper Michael Hartman of the Illinois State Police was observing traffic on Interstate 55 in Madison County, Illinois. Around 10:15 a.m., the officer stopped a six-wheel pickup truck that was pulling a goose-neck trailer because it was travelling 62 miles per hour in a 55 mile-

---

* The Honorable Robert L. Miller, District Judge for the Northern District of Indiana, sitting by designation.

per-hour zone.[1] The driver was Stephen Willis. He gave the trooper his driver's license and vehicle registration and told the officer that he was returning to Rhode Island from Tucson, Arizona, where he had visited his sister. After a computer check indicated that Mr. Willis' license was valid, the trooper wrote Mr. Willis a warning ticket.

Trooper Hartman handed Mr. Willis a clipboard displaying the warning ticket and asked for his signature. The trooper had placed a consent to search form underneath the warning ticket. The ticket concealed all of the consent to search form except the signature line on the bottom of that form. There was an X at the signature line of the consent to search form. When the officer told Mr. Willis to sign at the bottom, Mr. Willis signed the consent to search form. The trooper then advised Mr. Willis that he had signed the wrong spot, and asked him to sign the warning ticket at the correct location. Once he handed back Mr. Willis' paperwork, the trooper told Willis that he was free to go. However, the officer also stated that he had a few questions, and asked if he could raise them with Mr. Willis. Mr. Willis consented. Trooper Hartman first asked him whether he had weapons or drugs in the vehicle; Mr. Willis said no. The officer then asked if he could search the vehicle and the trailer. One fact upon which the parties disagree is whether the trooper showed Mr.

Willis the signed consent form at the time he asked to search or after Mr. Willis had consented to the search.[2] They both acknowledge that Mr. Willis gave his permission for the search, however, and that he told the trooper that he was transporting a 1966 Porsche in the trailer. They also agree that the trooper lifted the warning ticket on his clipboard, showed Mr. Willis the signed consent form, informed Mr. Willis that he had already signed it, and asked him if he wanted to look it over. Mr. Willis declined, and told the officer that he could go ahead and search.

Trooper Hartman found the Porsche inside the trailer, and noticed a freshly painted area of the trailer that covered what he thought might be a hidden compartment. When he asked Mr. Willis to accompany him to a nearby gasoline station for a further search, Mr. Willis agreed. With the assistance of two more officers and a police dog, Trooper Hartman found marijuana in the suspicious compartment. At that time, Mr. Willis was placed under arrest and was read his *Miranda* rights. When the vehicle was searched thoroughly at the Illinois State Police headquarters, other compartments containing bundles of marijuana were located. In all, 146 kilograms of marijuana were found.

On December 23, 1993, the day after the arrest, Trooper Hartman signed a verified

---

**1.** The trooper first observed Mr. Willis' truck at 10:13 a.m. He stopped the truck at 10:15. Mr. Willis signed the consent to search form at 10:18 a.m.

**2.** A comparison of two statements made by Trooper Hartman reflects the timing differences noted by the parties. Here is the pertinent testimony given during direct examination:

A. Once he had signed the warning, he handed the clipboard back to me and my ink pen and at that time I gave Mr. Willis the rest of his paperwork back and I told him he was free to go and I thanked him for his time. I then asked Mr. Willis if I could ask him a couple of questions, and Mr. Willis said sure go ahead. I asked him if he was carrying any weapons in his vehicle today and he said no. I further asked Mr. Willis if he was transporting any drugs or carrying in his vehicle any drugs, and again he said no. I then asked Mr. Willis, I told him that I was curious what he had in his trailer and I asked would you mind if I search your truck and your trailer and he said sure go

ahead, and then he told me that he was transporting, I believe, a '66 Porsche in the trailer.

. . . . .

Q. What if anything did you do with the consent to search form?
A. Well, at that time I lifted the warning and I showed Mr. Willis, I said this is our State Police consent to search form, you have already signed it before I had wanted you to, would you like to look it over? No, no, you can go ahead and search, that's fine.
Tr. II at 9. Below is the pertinent testimony given on cross-examination:
Q. So it was after he had the paperwork back and after you say he was free to go, that's when you first asked him if you could search his vehicle, right?
A. That's right.
Q. And that was the time that you also made him aware of the fact that on your clipboard in your possession was a consent to search form that he had already signed?
A. That's correct.
Tr.II at 29.

criminal complaint against Mr. Willis. It stated that Mr. Willis was given a written warning for a traffic violation (¶ 4); and that, after his license was returned to him, Mr. Willis gave written consent for the search of his vehicle and trailer (¶ 5). However, at the suppression hearing the trooper admitted that paragraph five was false, because Mr. Willis had signed the consent form, without knowing what it was, before the paperwork was handed back.

On January 21, 1994, Mr. Willis was charged in a one-count indictment with possession with intent to distribute more than 100 kilograms of marijuana. At trial the government's main witness was Trooper Hartman. He testified to the stop and search of the defendant's vehicles and to the arrest of the defendant.[3] Among the others to appear at trial for the government was Timothy Brunholtz, an agent with the Drug Enforcement Administration for twenty-three years and an expert on narcotics transportation cases. He testified, over objection, that he had never had a drug case in which the courier did not know what he was transporting. The witnesses for the defendant included his mother, daughter and girlfriend. Mr. Willis also testified on his own behalf. In describing his relationship with his former wife Elizabeth since their divorce, the defendant testified that he had transported a car from Arizona to Rhode Island for Elizabeth in June 1993, and that her friend Oscar had picked up the vehicle and trailer in Rhode Island. He was transporting the Porsche for her when he was arrested because she had told him that she would pay him overdue child support payments with the money she made from selling the car. He denied any knowledge of drugs in the vehicles.

On March 16, 1994, a jury in the Southern District of Illinois returned a verdict of guilty against the defendant. On June 8, 1994, the defendant was sentenced to 78 months of imprisonment. Mr. Willis filed a timely notice of appeal; he raises four issues challenging his conviction.

## II

### DISCUSSION

#### A. *Pretrial Issues*

Prior to trial Mr. Willis raised two issues in a motion to suppress evidence. He submitted that the traffic stop conducted by Trooper Hartman was pretextual and that his consent to the search of his trailer was not voluntary. The district court denied the motion to suppress. We shall consider each issue in turn.

##### 1. Pretextual Stop

■ Mr. Willis first appeals the denial of his suppression motion on the ground that there had been no probable cause to stop his vehicle. He submits that the stop was a pretext to facilitate a search for narcotics, and that the trooper's motivation for stopping him was simply a "hunch" that the defendant was engaged in illegal activity. As Mr. Willis acknowledges, our court reviews a district court's denial of a motion to suppress under the clearly erroneous standard. *United States v. Gilbert*, 45 F.3d 1163, 1165 (7th Cir.1995); *United States v. Adebayo*, 985 F.2d 1333, 1337 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2947, 124 L.Ed.2d 695 (1993). In our review, we examine the evidence presented to the district court. Because the district court was able to hear and to observe the witnesses, we defer to the district court's factual determinations. We shall find clear error only if, after our review of the evidence, we are firmly convinced that a mistake has been made. *United States v. James*, 40 F.3d 850, 874 (7th Cir.1994) (citing *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir.1994)), *cert. denied*, —— U.S. ——, 115 S.Ct. 948, 130 L.Ed.2d 891 (1995).

---

**3.** Among the documents found in the truck were certificates of title to the trailer (registered to the defendant) and to the Porsche (registered to Elizabeth Willis, the defendant's former wife). Mr. Willis had obtained a 30–day non-resident registration for the truck. He testified that there were problems with the registration and insurance, and that he had finally put them in his name so that he could leave Arizona. He also had told the trooper that Elizabeth Willis was his sister. A note signed by Elizabeth Willis, found in the vehicles, gave permission to "my brother Steve Willis to transport my '66 Porsche to Rhode Island." It was later determined that Elizabeth Willis was Steve Willis' ex-wife.

The underlying principle is clear: If an arrest or a traffic stop is used merely as a pretext to search for evidence, that search constitutes a violation of the Fourth Amendment. *United States v. Lefkowitz,* 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932); *United States v. Quinones–Sandoval,* 943 F.2d 771, 774 (7th Cir.1991). However, our circuit's test for reviewing the lawfulness of a stop or arrest that is alleged to be pretextual has been set forth clearly in *United States v. Trigg,* 878 F.2d 1037 (7th Cir.1989). That case requires an objective analysis of the circumstances; if there was probable cause to make the stop, and if the stopping officer was acting with authority, the stop was not pretextual. "[S]o long as the police are doing no more than they are legally permitted and objectively authorized to do, an arrest is constitutional." *Id.* at 1041; *see also Quinones–Sandoval,* 943 F.2d at 774; *United States v. Rivera,* 906 F.2d 319, 321 (7th Cir.1990).

Mr. Willis admits that the *Trigg* test is the law of this circuit, and that Trooper Hartman is authorized to enforce Illinois traffic laws on interstate highways in Illinois. He further acknowledges the officer's testimony that he had probable cause to stop Mr. Willis' vehicle for speeding; indeed, Mr. Willis does not deny that he was speeding. Nevertheless, the defendant asserts that Trooper Hartman's "pattern of conduct" revealed that the stop in this case was in fact a mere pretext. Because Trooper Hartman did not "radar" the defendant's vehicle until it passed the officer, Mr. Willis first submits that the trooper was looking for vehicles that had out-of-state license plates.[4] Mr. Willis notes Trooper Hartman's admission that it was possible that most felony drug arrests he made along that stretch of road were the result of stopping vehicles with out-of-state license plates. He also reminds us that the officer already had prepared and filled out the consent to search form when he present-

ed Mr. Willis with the warning ticket. The defendant contends, therefore, that Trooper Hartman—a member of a drug interdiction team, not a traffic officer—selectively operated his radar on out-of-state vehicles, looking for drugs, and that his stop of Mr. Willis' vehicle was merely a pretext to facilitate a drug search.

Mr. Willis' position is not compatible with the objective nature of our review. *Trigg* mandates a Fourth Amendment inquiry that "eschew[s] ... the subjective motive examination" urged by Mr. Willis. *See United States v. Fiala,* 929 F.2d 285, 287 (7th Cir.1991). Once we determine that the stop was based on a reasonable suspicion or probable cause, and that the officer was authorized by law to make the stop, the stop is constitutionally valid. *See United States v. Mounts,* 35 F.3d 1208, 1213 (7th Cir.1994) ("Police officers are justified in conducting a brief investigative *Terry* stop if [the] officer is able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.") (quotations, citations omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 1366, 131 L.Ed.2d 222 (1995). In this case there is no challenge to the facts that Mr. Willis' vehicle was speeding and that Trooper Hartman was authorized to stop his vehicle for a violation of Illinois law. Speeding is certainly a legitimate reason for stopping the vehicle. *See* 625 ILCS 5/11–601; *United States v. Woody,* 55 F.3d 1257, 1268 (7th Cir.1995); *United States v. Garcia,* 897 F.2d 1413, 1419 (7th Cir.1990). Because the stop was an objectively reasonable one under *Trigg,* and one the trooper was empowered to make, we need not consider Mr. Willis' subjectively-based submission that the basis for the stop was pretextual.

2. The Voluntariness of Mr. Willis' Consent to Search

Mr. Willis next submits that his verbal consent to the search of his truck and trailer

---

4. Trooper Hartman testified that he did not leave the radar gun on, to avoid discovery by radar detectors, and that he had not turned on the radar gun to check the defendant's speed because the trooper's vehicle was in traffic and his radar gun was unable to pick out a specific vehicle. Once he had observed that Mr. Willis' truck was speeding, however, he pulled out behind the vehicle and both paced its speed with his odometer and made a radar check of the speed. Mr. Willis does not dispute the calculated speed of 62 miles per hour, and the district court clearly believed the trooper's explanation.

was not voluntary. According to the defendant, Trooper Hartman arranged the consent to search form under the warning ticket on his clipboard so that its signature line was at the bottom. The officer then told the defendant, as he handed him the clipboard, that he was giving him just a warning, and that he should sign it at the bottom. Mr. Willis mistakenly signed the consent form rather than the warning ticket. The defendant further points out that the officer did not advise him of his mistake until he was seeking verbal consent to search the vehicles, and did not tell him that he could withdraw the written consent.[5] Under these circumstances, contends Mr. Willis, the trooper's use of the written consent while seeking verbal consent for the search was improper and caused the verbal consent not to be a product of the defendant's free will.

■ In *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), the Supreme Court of the United States held that whether a consent to search was voluntary "is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227, 93 S.Ct. at 2048. We review the district court's factual determination for clear error. *United States v. Price*, 54 F.3d 342, 345 (7th Cir.1995). If the consent to search is voluntary, that consent removes the Fourth Amendment's warrant requirement. *Quinones–Sandoval*, 943 F.2d at 774. The burden of proving voluntariness, however, is on the government. *United States v. Taylor*, 31 F.3d 459, 463 (7th Cir.

1994) (citing *Schneckloth,* 412 U.S. at 222, 93 S.Ct. at 2045).

■ The district court, at the suppression hearing, considered whether the trooper intentionally had obtained Mr. Willis' signature on the wrong form in order to coerce his oral consent. After hearing all the testimony and argument of counsel, the court concluded that the trooper's offer to Mr. Willis to review the written consent form was an opportunity for Mr. Willis to withdraw his consent.[6] The court then rejected the defendant's contention that the officer intentionally obtained Mr. Willis' signature on the wrong document to get a verbal consent to search:

> THE COURT: But that isn't the evidence in this case. The evidence in this case is that it was clearly a mistake and an intentional accidental mistake and that the officer told your client about it, you signed the wrong form, can I search your truck, do you want to read this, do you want to look this over, and he said no, go ahead, search it. And see, it seems to me that it's quite clear that at any time your client wanted to, up until the time that they had some probable cause to make an arrest, which [was] ... certainly before he ever opened the door and went into the trailer your client could have said, I changed my mind, I'm late, have a nice day....
>
> ...
>
> ... [Y]ou're saying that there is psychologically an action that takes away the voluntariness of it, and I don't see that. I

---

5. Defense counsel referred to the following cross-examination exchange with Trooper Hartman:
 Q. So it was after he had the paperwork back and after you say he was free to go, that's when you first asked him if you could search the vehicle, correct?
 A (Hartman). That's right.
 Q. And that was the time that you also made him aware of the fact that on your clipboard in your possession was a consent to search form that he had already signed?
 A. That's correct.
 Q. When he signed the consent to search form, you indicated that he didn't want to read it after you showed him that he had signed the wrong form, is that correct?
 A. Yes.
 Q. So at the time that he signed the consent to search form, he had not read it, had he?
 A. No.

 Q. You hadn't shown it to him?
 A. I hadn't shown it to him. It was hidden mostly by the warning.
 Tr.II at 29–30.
 Q. After you became aware of the fact that Mr. Willis had erroneously signed this consent to search form, did you advise him that he did not have to consent to search this vehicle?
 A (Hartman). No.
 Tr.II at 51.

6. The court stated: "[Trooper Hartman] asked [Mr. Willis] and got his oral consent to search [the vehicle] and [the trooper] said then you have already signed [the written form], but if you want to read it and look at it, clearly [Mr. Willis] could have withdrawn his consent at any time." Tr.II at 48.

think it was a good search. Motion to suppress is denied.

Tr.II at 54–55.

In adjudicating the issue of voluntary consent to search, the district court was faced with a situation that would remind any Judge of the Third Branch of the priorities that must govern his judicial actions. The modus operandi of the trooper raised a very serious question about the voluntariness of the consent. The possibility that the officer overstepped his bounds was a very real one. Upon examination of the record—and mindful of the limitations of our own authority to review the factual findings of the district court—we must conclude that the district court's review of the voluntariness of Mr. Willis' consent was an adequate discharge of its responsibilities. Upon examination of the totality of the circumstances, the district court determined that Mr. Willis could have withdrawn his consent at any time, and that the trooper gave him the opportunity.

Although we must leave undisturbed the decision of the district court in this case, we note that the trooper testified that it was his practice to place the consent to search form under the ticket, and to write an "X" where the signature should be made on that form.[7] As long as this practice persists, federal judicial officers scrutinizing claims that consents to search were voluntary must be demanding in their insistence that the government shoulder its burden of establishing that any consent, written or oral, that is arguably the product of this procedure, was indeed a voluntary one.

### B. *Trial Rulings*

Mr. Willis also submits that the district court erred in admitting certain expert testimony and in giving an ostrich instruction to the jury.

#### 1. The Admission of Expert Testimony

Mr. Willis submits that Timothy Brunholtz, an agent of the Drug Enforcement Agency for twenty-three years, should not have been permitted to testify concerning the defendant's knowledge of the presence of marijuana in the hidden compartments of the trailer. The specific testimony to which Mr. Willis objected is:

Q. Based upon your experience in investigating these type of cases, does the person who is transporting the narcotics, the marijuana, know what's in the vehicles or in the trailers?

A. (Brunholtz): I have not had a case yet where I have arrested or participated in a transportation case where the courier didn't know what he was carrying.

Tr.III at 128–29. The defendant asserts that this statement was an improper comment concerning Mr. Willis' mental state, one that went to the ultimate issue whether Mr. Willis knew there was marijuana in the trailer. As such, he submits, the statement should have been excluded under Rule 704(b) of the Federal Rules of Evidence, for it "impermissibly state[d] an opinion as to the defendant's knowledge or willfulness, a mental state which constitutes an element of the crime charged." *United States v. Windfelder,* 790 F.2d 576, 582 (7th Cir.1986).

Federal Rule of Evidence 704 generally permits "otherwise admissible" testimony, offered in the form of an opinion or inference, to include comment on the ultimate issue to be decided by the trier of fact. Subsection (b) contains the exception to that rule:

(b) No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto. Such ultimate issues are matters for the trier of fact alone.

■ We review evidentiary rulings of the district court under a deferential standard. We shall reverse a ruling concerning admis-

---

7. The trooper testified that the consent to search form was "hidden mostly by the warning," Tr.II at 30, and that it was his habit to put an "X" on the signature line of the consent to search form and to have that form on his clipboard along with the warning ticket. However, he stated that "this is the first time that anybody has signed the consent to search form before I had asked them to." Tr.II at 33.

sion of expert testimony only upon a showing that the district court clearly abused its discretion. *United States v. Brown,* 7 F.3d 648, 651 (7th Cir.1993). Our court has recently reviewed the underlying purpose of Rule 704(b) in *United States v. Lipscomb,* 14 F.3d 1236 (7th Cir.1994), and has concluded that the rule was intended to limit expert testimony based on medical or psychological analysis of a defendant's mental processes, but not law enforcement testimony that does not depend on such analysis. *Id.* at 1241–42.

> [W]e conclude that when a law enforcement official states an opinion about the criminal nature of a defendant's activities, such testimony should not be excluded under Rule 704(b) as long as it is made clear, either by the court expressly or in the nature of the examination, that the opinion is based on the expert's knowledge of common criminal practices, and not on some special knowledge of the defendant's mental processes.

*Id.* at 1242.

■ In this case, Agent Brunholtz's professional expertise was not challenged. The agent was called solely as an expert witness, knowledgeable in drug trade practices. His testimony did not include any special knowledge of Mr. Willis or of the investigation in his case. He offered no opinion concerning Mr. Willis' knowledge or intentions; nor did he even suggest that his opinion was based on some special knowledge of Mr. Willis' mental processes. *See Lipscomb,* 14 F.3d at 1242–43 (describing such a suggestion as "improper"). We conclude that there was no violation of Rule 704(b) in this case, and that the district court's admission of the agent's expert testimony was not an abuse of its discretion.[8]

### 2. Ostrich Instruction

The district court, over the defendant's objection, gave the following "ostrich" or "deliberate avoidance" instruction:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his or her eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used the word.

The defendant claims that the court abused its discretion in giving that instruction. He submits that the jury charge requires that there be "facts and evidence that support an inference of deliberate avoidance," *United States v. Caliendo,* 910 F.2d 429, 433 (7th Cir.1990), "evidence that the defendant, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings." *United States v. Giovannetti,* 919 F.2d 1223, 1228 (7th Cir.1990). Relying on *United States v. Rodriguez,* 929 F.2d 1224 (7th Cir.1991), Mr. Willis asserts that "evidence that a person suspects wrongdoing, by itself, is not sufficient to justify giving an ostrich instruction." *Id.* at 1227. Unlike the defendant in *Rodriguez,* he points out, he did not handle the drugs or admit that he wanted to make money. He further submits that there is no evidence that he had reason to suspect that he was involved in criminal dealings, or that Elizabeth and/or Oscar were drug traffickers, and no evidence that he shut his eyes to any indication that there were drugs in the trailer.

■ We assess a district court's decision to give a particular jury instruction by reviewing the evidence, along with the reasonable inferences that can be drawn from that evidence, in the light most favorable to the government. *United States v. Hoyos,* 3 F.3d 232, 237 (7th Cir.1993); *United States v. Bigelow,* 914 F.2d 966, 970 (7th Cir.1990), *cert. denied,* 498 U.S. 1121, 111 S.Ct. 1077, 112 L.Ed.2d 1182 (1991). It is clear that proper use of this instruction is well approved in this circuit. *See Hoyos,* 3 F.3d at 237; *United States v. Gonzalez,* 933 F.2d 417, 433–34 (7th Cir.1991) (listing cases). When "the defendant claims a lack of guilty knowledge and there are facts and evidence that

---

**8.** We note, as well, that during cross-examination Agent Brunholtz agreed that a person's knowledge of the presence of drugs is something to be established in each case, depending on the individual circumstances. Tr.III at 130.

**534**

support an inference of deliberate ignorance," the ostrich instruction is appropriate. *United States v. Jackson,* 33 F.3d 866, 874 (7th Cir.1994) (quotations, citations omitted), *cert. denied,* —— U.S. ——, 115 S.Ct. 1316, 131 L.Ed.2d 197 (1995).

 In this case, Mr. Willis has claimed that he lacked knowledge of the presence of marijuana in the trailer. However, the district court, after hearing lengthy arguments of counsel concerning the instruction during the instructions conference, noted "all kinds of red flags being waived in front of this guy," facts that would have raised questions in the mind of a reasonable person. Because there was evidence of suspicious circumstances from which the jury could conclude that the defendant at least suspected that the purpose of the trip was narcotics-related, the court concluded that the jury should determine whether to believe Mr. Willis' explanations. For that reason it proffered the instruction to the jury.

Viewing the evidence in the light most favorable to the government, we believe that the conscious avoidance instruction was justified in this case. The jury was entitled to weigh whether a reasonable person, immersed in the activities and circumstances in which Mr. Willis was involved, would have realized or suspected that "shady dealings" were involved. *See Jackson,* 33 F.3d at 875; *Giovannetti,* 919 F.2d at 1228. We hold, therefore, that the district court did not abuse its discretion in deciding to give the "ostrich" or "deliberate avoidance" instruction.

### Conclusion

For the foregoing reasons, we affirm the district court's judgment of conviction.

AFFIRMED.