UNITED STATES of America, Plaintiff–Appellee,

v.

Tyrond BROWN, Defendant–Appellant.

No. 95–1421.

United States Court of Appeals, Seventh Circuit.

Argued Aug. 1, 1995.

Decided Aug. 31, 1995.

Steven M. Biskupic, Asst. U.S. Atty., Office of the United States Attorney, Milwaukee, WI, for plaintiff-appellee.

Martin E. Kohler, and Michael F. Hart (argued) Milwaukee, WI, for defendant-appellant.

Before POSNER, Chief Judge, and EASTERBROOK and ROVNER, Circuit Judges.

EASTERBROOK, Circuit Judge.

A cocaine buy-and-bust led the Drug Enforcement Administration to Tyrond Brown. An agent bought crack cocaine from Chris Johnson, who was immediately arrested. Johnson agreed to finger his source, "Ty," who was expecting payment, and a series of calls on portable telephones ensued. The agents drove Johnson to the agreed place, where they found at the curb a man meeting Johnson's description of his source. Johnson's enthusiasm for the venture waned; he refused to tell the agents whether this was indeed "Ty." So the officers debouched and asked the pedestrian to participate in an experiment. Could they press the redial button on the phone he was carrying? He said yes, they did, and Johnson's telephone rang. The agents arrested the man, who turned out to be Tyrond Brown. He pleaded guilty to a cocaine offense and was sentenced to 76 months' imprisonment. One reason Brown capitulated is that the prosecutor had more than a phone connection and Johnson's word to go on. Agents seized crack cocaine and $18,000 from Brown's apartment. Brown asked the court to suppress this evidence. After the court declined, 861 F.Supp. 1415 (E.D.Wis.1994), Brown entered a conditional plea of guilty, Fed.R.Crim.P. 11(a)(2), reserving the right to contest that ruling on appeal. The validity of the seizure therefore is the only question before us.

When arrested, Johnson had been driving someone else's car. He disclaimed any knowledge of its ownership, saying that a friend had lent it to him. The glove compartment of this car contained a rental agreement for a different auto; the customer was a Fannie Bonds, who gave her residence as Apartment 203 of an address in Brown Deer, Wisconsin. According to state records, Bonds also owned the car Johnson was driving. The agents found Brown standing immediately south of that address. When they asked him where he lived, he pointed to the northeast. (So the district judge concluded, and this finding is not clearly erroneous.) He claimed to have been standing on the street only because he was locked out of his own apartment. What was the role of Fannie Bonds? Was she another conspirator? Or was she perhaps a victim of auto theft—or worse? The doorbell for Apartment 203 bore the name of Bonds but not Brown. The agents searched Brown incident to the arrest, see *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), and found a set of keys. One of the agents knocked on the door of Apartment 203 and, receiving no answer, tried the key; it worked. Agents looked quickly in every room and saw what appeared to be cocaine on a night stand; they also saw two sturdy safes. They left the cocaine there and closed the door. One agent set off to secure a search warrant; two others stayed to guard the apartment. While they were waiting, Bonds appeared. She turned out to be

Brown's mother. According to one agent, Bonds consented to a search of the apartment. The district judge, adopting a magistrate judge's findings on this issue, concluded that Bonds's consent was ineffective—but it made no difference, because the agent did not seize anything until the warrant arrived.

Brown acknowledges that the warrant was supported by probable cause, but he argues that the initial warrantless entry spoiled the eventual seizure. (The application for the warrant recited that the agents had seen the cocaine and safes.) The district court concluded that the initial entry violated the Constitution but declined to suppress the evidence. First, the court held, by pointing to the northeast Brown disclaimed any interest in the apartment, so the search violated only Bonds's rights. Second, the court concluded that the agents had probable cause before the initial entry into Apartment 203, making it likely that they would get a warrant anyway; the inevitable-discovery doctrine of *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), therefore disentitled Brown to the remedy of suppression.

■ The district court's principal reason is mistaken and the second is questionable. Let us assume that Brown lied to the agents about his habitation. That does not affect that fact that he *did* live in Apartment 203. Everyone has a legitimate expectation of privacy in his residence. Ours is not like the case of a courier who disclaims interest in a drug-filled suitcase, or a suspect who throws drugs on the street and flees. People are free to expose their belongings to the public, or to throw them away; seizing abandoned suitcases from baggage carousels does not invade anyone's privacy interest. The privacy interest in a dwelling is not so easily extinguished, see *Michigan v. Clifford*, 464 U.S. 287, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984), and a misleading response to an officer's question is a far cry from a consent to search. Brown therefore has rights under the fourth amendment enforceable in this prosecution. See *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

■ As for inevitable discovery: what makes a discovery "inevitable" is not probable cause alone, as the district judge thought, but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search. Otherwise the requirement of a warrant for a residential entry will never be enforced by the exclusionary rule. A warrant requirement matters only when the police have probable cause, because otherwise they can't get one. (Under the second clause of the fourth amendment, "no Warrants shall issue, but upon probable cause".) To say that a warrant is required for a search is to say that the police must get judicial approval before acting. Yet if probable cause means that discovery is inevitable, then the prior-approval requirement has been nullified. An argument can be made that probable cause is enough to make a daylight search reasonable, that the second clause of the fourth amendment disfavors warrants, and that those "who have viewed the fourth amendment primarily as a requirement that searches be covered by warrants, have stood the amendment on its head." Telford Taylor, *Two Studies in Constitutional Interpretation* 46–47 (1969). See also Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv.L.Rev. 757, 762–70, 801–11 (1994). But this is not the Supreme Court's current understanding. See *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), overruling *United States v. Rabinowitz*, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

■ Although some language in *United States v. Buchanan*, 910 F.2d 1571 (7th Cir. 1990), can be read to say that probable cause alone makes discovery under a warrant "inevitable," that language was a response to the parties' arguments and does not enlarge the inevitable-discovery doctrine. Buchanan's principal argument on appeal was that the warrant had not been supported by probable cause; his willingness to let the case turn on the answer to that question does not imply that for all future cases probable cause establishes inevitable discovery. See *United States v. Johnson*, 22 F.3d 674, 684 (6th Cir.1994). We need not decide whether these agents inevitably would have obtained

a warrant without the quick search of the premises—as they well might, had Brown told them that he lived in Apartment 203 and that Bonds is his mother—because we conclude that the agents' once-over did not violate Brown's rights given the facts as the agents reasonably supposed them to be.

Special Agent Melick testified that the officers entered Apartment 203 because they were concerned about Bonds's safety. The district judge believed Melick, adding that the discovery of the apartment key in Brown's possession, coupled with his implicit claim that he lived elsewhere, would lead a reasonable agent to take precautions. 861 F.Supp. at 1420. Nonetheless, the judge concluded, the entry violated the fourth amendment because the agents lacked exigent circumstances—which the judge understood to be present only if there was a powerful reason to believe that Bonds was in "immediate danger." We do not think that the police must stand outside an apartment, despite legitimate concerns about the welfare of the occupant, unless they can hear screams. Doubtless outcries would justify entry, *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), but they are not essential. The less intrusive a search, the less justification is required. This is true not only of street stops, see *United States v. Chaidez,* 919 F.2d 1193 (7th Cir.1990), but also of residential searches. See *United States v. Concepcion,* 942 F.2d 1170 (7th Cir.1991) (insertion of key in keyhole is a "search" but requires only slight justification). The question posed by the fourth amendment is not whether it would have been reasonable to get a warrant, but whether the search itself was reasonable. *United States v. Edwards,* 415 U.S. 800, 807, 94 S.Ct. 1234, 1239, 39 L.Ed.2d 771 (1974). Entry into a domicile usually requires a search warrant, *Welsh v. Wisconsin,* 466 U.S. 740, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984); *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), which can be had only on probable cause, but quick inspections may be justified by lower degrees of suspicion. Consider the "protective sweep" cases, of which *Maryland v. Buie,* 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), is a prime example. *Buie* held that the police may walk through rooms adjacent to the one in which they make an arrest, to ensure that no danger lurks within. Cf. *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). The officers need not demonstrate any danger; they may look simply as a precaution. Just so here; with some (though far from strong) reason to fear for Bonds's safety, the agents could take some steps to protect her. See *Murdock v. Stout,* 54 F.3d 1437, 1442 (9th Cir.1995) ("only a mild exigency need be shown where entry can be accomplished ... without physical destruction of property.").

These agents had legitimate concerns about Bonds's safety. Had they known then what we know now—that Brown lived in Apartment 203 and that Bonds is his mother (dispelling concerns about her safety)—they would have required a warrant to enter. But at the time objective indicators did not suggest that Apartment 203 *was* his residence. He had pointed elsewhere, and he did not claim any interest in the place; the doorbell named Bonds as the occupant. The reasonableness of a search depends on what the police know at the time, not on what they learn later. See *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). When the agents entered Apartment 203, they may have doubted Brown's disclaimer, but Brown himself—the most ardent guardian of his privacy, one might suppose—had supplied no reason to believe that they were invading his abode. If as Brown said he was locked out of his own apartment, then a key that opened the door of Apartment 203 could not have led to Brown's residence. Our point is not that Brown surrendered his privacy interest in Apartment 203 but that the facts then known to the agents painted a different picture. When planning their actions, they were entitled to concentrate on Bonds's interests, which included safety as well as seclusion.

An officer on the beat must be allowed latitude to make snap judgments, subject to the requirement of reasonableness. The decision to take a brief look inside Apartment 203 was a reasonable one, carried out reason-

ably (the agents did not tarry longer than required to fulfil their purpose). Entry indeed was practically invited by Brown. Had he told the agents the truth, that not only would have dispelled concern about Bonds but also would have sent them scampering to court for a warrant, protecting everyone's entitlements. Brown's arrest for a cocaine offense would have supplied probable cause to search his residence for drugs, proceeds, and weapons; the officers did not need any extra information to obtain legitimate entry. Having credited Agent Melick's statement that he entered in advance of the warrant only out of concern for Bonds's safety, see 861 F.Supp. at 1420, the district judge should have reached the natural conclusion that the search was reasonable. Only a legal error—the supposition that entry cannot be justified without proof of "immediate danger"—led the judge to do otherwise. When reviewing decisions about searches, we defer to the district judge's findings of fact and to its ultimate conclusions about the propriety of the search. *United States v. Spears,* 965 F.2d 262 (7th Cir.1992). We have done both today, adding only the principle that the victorious party may defend its judgment with any properly preserved argument, whether or not the district judge accepted it. *United States v. New York Telephone Co.,* 434 U.S. 159, 166 n. 8, 98 S.Ct. 364, 369 n. 8, 54 L.Ed.2d 376 (1977) (applying this rule to a case under the fourth amendment); *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 439 (7th Cir.1987).

AFFIRMED.

ILANA DIAMOND ROVNER, Circuit Judge, dissenting.

For better or for worse, this circuit has forsaken a more searching review of the district courts' suppression rulings and opted to review these rulings for clear error only. See *United States v. Spears,* 965 F.2d 262, 269–71 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992); *see also, e.g., United States v. Willis,* 61 F.3d 526, 529 (7th Cir.1995); *United States v. Saadeh,* 61 F.3d 510, 515–16 (7th Cir.1995). Applying that deferential standard, we will disturb the district court's decision only "if we are left with the definite and firm conviction that a mistake has been made." *Id.; see also Willis,* 61 F.3d at 529; *United States v. Veras,* 51 F.3d 1365, 1370 (7th Cir.1995). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

After hearing the evidence, the magistrate judge below found that the circumstances surrounding the initial entry into the apartment were not exigent and thus did not excuse the failure to obtain a warrant (Report and Recommendation at 7–13), and the district court expressly adopted that finding (861 F.Supp. 1415, 1420). Nonetheless, my colleagues in the majority—among the leading progenitors of the clearly erroneous standard of review, *see, e.g., United States v. McKinney,* 919 F.2d 405, 418–23 (7th Cir. 1990) (Posner, J., concurring); *United States v. Malin,* 908 F.2d 163, 169–70 (7th Cir.) (Easterbrook and Posner, JJ., concurring), *cert. denied,* 498 U.S. 991, 111 S.Ct. 534, 112 L.Ed.2d 544 (1990)—all but ignore the district court's finding on this critical point. Examining the facts afresh, they have concluded that a mild exigency justified a limited intrusion by the agents into the apartment before they sought the approval of a magistrate. *Ante* at 1086–87. I cannot square this conclusion with the limits that the clearly erroneous standard imposes upon our review. Moreover, I am deeply disturbed by the implications of the court's rather liberal invocation of the exigent circumstances exception to the warrant requirement.

The magistrate judge carefully considered whether the circumstances confronting the agents were sufficiently grave to warrant an unauthorized intrusion into Fannie Bonds' apartment. Because the majority merely mentions the lower court's conclusion and ignores its rationale (*see ante* at 1086), I think it illuminating to recount the magistrate judge's reasoning at length:

> The government seeks to justify its actions based upon the possibility that Fannie Bonds was being held captive or was injured. This is a potentially grave harm,

but what level of confidence could the government have in its belief that Fannie Bonds faced such a danger? The government knew that Johnson was armed when he was arrested and cocaine trafficking is known to be an inherently dangerous criminal activity. Any concern Melick had was not alleviated when Brown refused to answer questions, but it was Brown's right to refuse, and his silence could as readily indicate an attempt to protect Bonds from law enforcement contact. Contrary to the government's assertion, there is no testimony that Brown ever denied knowing Bonds; he simply refused to answer. Moreover, the theory that Brown and Johnson might have forcibly taken control of [Bonds'] premises and vehicle to engage in drug trafficking is not supported by any specific testimony or any general evidence that this is a common practice amongst drug dealers. In fact, this would seem an unlikely scenario since it would draw unnecessary and unwanted attention.

In short, nothing specific or concrete points to the fact that Bonds, or anyone else inside the apartment, was in danger; nor was there anything concrete that placed Bonds most recently inside the apartment. *Contrast United States v. Arch,* 7 F.3d [1300] at 1304–05 [ (7th Cir. 1993) ] (officer observed a room in disarray, with furniture overturned, beds torn apart, and the floor littered with syringes and a bloody rag) [*cert. denied,* —— U.S. ——, 114 S.Ct. 1123, 127 L.Ed.2d 431 (1994) ].

Was there anything supporting a need for immediate action? The officers' entry into the apartment came at least several hours after Johnson was first found in possession of Bonds' car. Nothing took place in the interim which would cause the officers to suspect any change in the status quo; even if the status quo was unknown. There is no testimony that the officers heard any sounds coming from the apartment or any other indicators that the status quo could change if, for instance[,] Bonds was being held captive inside and Brown failed to return to the apartment. There simply was no *apparent* need for immediate action. Taking judicial notice, the court would also note that had there been probable cause, the delay incurred by seeking a warrant need not have been substantial since warrants in this metropolitan area are available on very short notice.

Most troubling about this case is that there are several plausible explanations for Bonds' identity. The vehicle could have belonged to Brown, but been titled under the name of a family member, which is not unusual in cocaine trafficking cases. Brown may have been authorized to use the vehicle and did not want to get Bonds involved. Bonds could have been a coconspirator whom Brown was protecting. Despite all these plausible explanations, the government seizes upon what seems to be the least plausible, intimating that Bonds was being held against her will while her apartment and car were used for drug dealing.

Equally troubling is that the government chose the most intrusive means to pursue the least plausible explanation. Rather than start by attempting to locate the apartment manager or by knocking on neighbors' doors and asking if they could identify Brown, or if they knew anything about Fannie Bonds' whereabouts, the officers violated Bonds' and Brown's Fourth Amendment rights by conducting a warrantless search. Although the court does not doubt that Melick entertained some concern for Fannie Bonds' well being, the court doubts that Melick's subjective concerns ever ripened into more than a hunch or a passing concern. For instance, there was no testimony that the officers entered with weapons drawn, or took steps to ascertain what dangers lurk[ed] within before entering the apartment. *See [United States v.] Salava,* 978 F.2d [320] at 324 [ (7th Cir.1992) ] (precautionary measures to assure officer safety that delayed entry for over an hour did not nullify the exigency). There is no evidence that following Johnson's arrest the officers were attempting to locate Bonds or taking measures to assure her safety; they were pursuing their investigation of Johnson's drug trafficking and cultivating his cooperation.

For all of the foregoing reasons, the court finds that on an objective level, there simply are not facts which could reasonably lead to the conclusion that anyone was inside the apartment in immediate danger. Report and Recommendation at 10–13 (emphasis in original); *see also* 861 F.Supp. at 1420 (adopting this analysis). I am hard pressed to identify the clear error in this analysis. I suppose it was *possible,* given the facts known to the agents when they first entered the apartment, that Bonds might be found bound and gagged, possibly injured, inside. And like the district court, I do not doubt that Special Agent Melick harbored some concern for Fannie Bonds' well-being. *See* 861 F.Supp. at 1420. But there were no signs of foul play that would compel a finding of exigent circumstances. Although Johnson was armed, neither he nor Brown was arrested for committing a violent crime; neither the car Johnson was driving nor the vehicle referenced in the rental agreement had been reported stolen, and it is hardly out of the ordinary for an individual to drive a car belonging to someone else; nor is it unusual for a person to carry a key to an apartment bearing someone else's name on the doorbell—houseguests, roommates, new tenants, and family members with different last names do so routinely; and, finally, there was no trail of blood, muffled scream, nor any other clue suggesting that harm might have befallen Mrs. Bonds.

The majority itself candidly acknowledges that the agents' reasons for concern over Mrs. Bonds' safety were "far from strong," and so justified only a limited intrusion into the apartment. *Ante* at 1086. I find no comfort, and little deference to the Fourth Amendment, in this acknowledgement. Characterizing the circumstances as "mildly exigent" (*ante* at 1086, quoting *Murdock v. Stout,* 54 F.3d 1437, 1442 (9th Cir.1995)) is a bit like saying one is a "little pregnant." Until today, the exigent circumstances exception to the warrant requirement has been reserved for instances in which the known facts objectively required prompt action to alleviate a concrete risk of bodily harm or the destruction of evidence. *See, e.g., Saadeh,* 61 F.3d at 515–16; *United States v. Hardy,* 52 F.3d 147, 149 (7th Cir.1995), *cert. denied,* —

U.S. ——, 116 S.Ct. 207, —— L.Ed.2d —— (1995). By recognizing a category of "mild exigencies," the majority has effectively endorsed hunches and suspicions as the basis for warrantless entries and searches. I suspect it is a fairly common occurrence for the police to arrest someone driving a car titled in someone else's name or carrying keys to an apartment with which he or she has no readily confirmed, legitimate connection. But as I read the majority's reasoning, just this sort of routine circumstance may present a "mild" exigency justifying a warrantless search even if the vehicle has not been reported stolen or the apartment burglarized. The police need not knock on a neighbor's door to see if anyone recognizes the arrested individual; they need not make phone calls to see if their fears about the safety of the car owner or apartment dweller can be verified; they need not await the approval of a neutral magistrate, even if a warrant could be obtained in short order, as the magistrate judge was confident it could have been (Report and Recommendation at 11–12). Instead, the authorities may simply enter a home, uninvited and without a warrant. And they were entitled to do so here, the majority reasons in part, because the inspection was "quick" (*ante* at 1086) and because it involved no physical destruction of the property (*ante* at 1086, citing *Murdock,* 54 F.3d at 1442). Yet, at bottom, a warrantless entry into one's home is no less an intrusion simply because it is brief and accomplished with a key rather than an axe.

Thus, I am loathe to employ the majority's "sliding scale" approach ("[t]he less intrusive a search, the less justification is required" (*ante* at 1086)) as license for warrantless intrusions into private dwellings. *Cf. United States v. Chaidez,* 919 F.2d 1193, 1203–07 (7th Cir.1990) (Ripple, J., dissenting from the adoption of a sliding scale assessment of the degree of suspicion necessary to justify the detention of a person), *cert. denied sub nom. Chavira v. United States,* 501 U.S. 1234, 111 S.Ct. 2861, 115 L.Ed.2d 1028 and *cert. denied,* 502 U.S. 872, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991). The residential threshold is not simply an arbitrary point on a continuum of places that the government

may search; it sets off a private realm that the Fourth Amendment singles out for vigilant protection.

> In [no setting] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their ... houses ... shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 [ (1961) ]. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York,* 445 U.S. 573, 589–90, 100 S.Ct. 1371, 1381–82, 63 L.Ed.2d 639 (1980). Articulating what constitutes a "mild exigency" and the degree of intrusion such an exigency permits seems to me a task fraught with problems, and ambiguities in this aspect of Fourth Amendment jurisprudence will serve only to invite further encroachment upon the seclusion of the home. The majority's rationale might be paraphrased in the diminutive—"little emergencies justify little intrusions"—but I fear that the hole it has opened in the Fourth Amendment is gaping.[1]

Like the majority, I do not think that the evidence seized from Apartment 203 could be admitted on either of the alternate grounds upon which the district court relied. Without reservation, I agree with the majority that Brown cannot be said to have disclaimed his Fourth Amendment expectation of privacy in the apartment merely by pointing his finger away from the apartment. *Ante* at 1085. I also agree that the record as it stands does not permit reliance on the inevitable discovery doctrine (*see Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)), although my reasoning differs somewhat from that of the majority in this regard. The district court did not, as the majority suggests, simply assume that probable cause to search the apartment was enough to establish inevitable discovery. *See ante* at 1085. Rather, the court engaged in the very two-pronged inquiry we set out in *United States v. Buchanan,* 910 F.2d 1571, 1573 (7th Cir.

1. I do not subscribe to the notion that "probable cause is enough to make a daylight search reasonable," or that "the second clause of the fourth amendment disfavors warrants." *See ante* at 1085 (citing Telford Taylor, *Two Studies in Constitutional Interpretation* 46–47 (1969)). Whatever historical support there may be for the argument that the framers were more concerned about abuse of the warrant than warrantless searches, the modern cornerstone of Fourth Amendment jurisprudence is that warrantless searches of the home are presumptively unreasonable. *E.g., Arizona v. Hicks,* 480 U.S. 321, 326–27, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987); *Welsh v. Wisconsin,* 466 U.S. 740, 748–49, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984); *United States v. Ross,* 456 U.S. 798, 824–25, 102 S.Ct. 2157, 2173, 72 L.Ed.2d 572 (1982); *Payton v. New York,* 445 U.S. at 586, 100 S.Ct. at 1380. That premise is, I believe, true to the central mission of the Fourth Amendment.

> The main aim of the Fourth Amendment is against invasion of the right of privacy as to one's effects and papers without regard to the result of such invasion. The purpose of the Fourth Amendment was to assure that the existence of probable cause as the legal basis for making a search was to be determined by a judicial officer before arrest and not after, subject only to what is necessarily to be excepted from such requirement. The exceptions cannot be enthroned into the rule. The justification for intrusion into a man's privacy was to be determined by a magistrate uninfluenced by what may turn out to be a successful search for papers, the desire to search for which might be the very reason for the Fourth Amendment's prohibition. The framers did not regard judicial authorization as a formal requirement for a piece of paper. They deemed a man's belongings part of his personality and his life. *United States v. Rabinowitz,* 339 U.S. 56, 80, 70 S.Ct. 430, 441–42, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting). Thus, even if the Supreme Court's "current understanding" of the Fourth Amendment (*see ante* at 1085) is more expansive than the asserted understanding of the framers, I see no reason to retreat to colonial norms. "The Fourth Amendment makes a pledge to the American people. It states an ideal; it is not a constitutional wrench that 'locks-in' search and seizure practices of a vanished era." Tracey Maclin, *When the Cure for the Fourth Amendment is Worse Than the Disease,* 68 S.Cal.L.Rev. 1, 11 (1994).

1990), asking first whether the agents inevitably would have sought a warrant to search the apartment and second, whether a neutral magistrate would have issued it. 861 F.Supp. at 1424. *Buchanan* has been characterized as "a radical departure from the Fourth Amendment" (*United States v. Johnson*, 22 F.3d 674, 684 (6th Cir.1994)), but perhaps the problem has less to do with the test *Buchanan* articulated than the rigor with which we apply that test. We thought it an "easy" question in *Buchanan* whether the police would have applied for a warrant to search the defendant's hotel room absent the discovery of contraband during their initial warrantless entry. 910 F.2d at 1573.[2] Similarly here, it "seem[ed] certain" to the district court that the agents would have applied for a warrant to search Apartment 203 even without the precursory looksee. 861 F.Supp. at 1424. That assumption is certainly not illogical, but as I read both *Nix* and *Buchanan*, we may not indulge in casual assumptions about what the authorities would have done. Where, as here, the eventual application for a search warrant was tainted by what the authorities saw in the course of a preliminary warrantless search of the premises, the government bears the burden of *proving*, by a preponderance of the evidence, that its agents would in fact have sought a warrant even without the knowledge they gleaned from the warrantless intrusion. *See Nix*, 467 U.S. at 444, 104 S.Ct. at 2509. The government made no attempt at such a showing here. Indeed, as the district court pointed out, the government did not pursue the theory of inevitable discovery until after the magistrate judge had issued his report and recommendation (861 F.Supp. at 1419–20, 1423); consequently, the theory was not explored at all during the evidentiary hearing below. Thus, absent further record development, I agree that the district court clearly erred in allowing evidence as to what was found in the apartment to be admitted under the inevitable discovery doctrine.

Because the record does not lend sufficient support to any of the theories that the government has advanced, I would reverse the denial of Brown's motion to suppress and remand for further proceedings.

2. It may be, as the majority suggests, that the court thought this question "easy" because Buchanan's appeal was focused primarily on the second prong of the analysis—whether the magistrate would have found probable cause to issue a search warrant. *Ante* at 1085; *see Buchanan*, 910 F.2d at 1573.