**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**David S. GRAVENS, Defendant-
Appellant.**

**No. 96–3704.**

United States Court of Appeals,
Seventh Circuit.

Argued April 17, 1997.

Decided Nov. 21, 1997.

Robert N. Trgovich (argued), Office of the United States Attorney, Fort Wayne, IN, for Plaintiff–Appellee.

Travis S. Friend (argued), Beckman, Lawson, Sandler, Snyder & Federoff, Fort Wayne, IN, for Defendant–Appellant.

Before POSNER, Chief Judge, COFFEY and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

On November 29, 1995, a federal grand jury indicted the defendant-appellant, David Gravens, alleging violations of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2). The Government charged that Gravens, as a convicted felon, was in possession of firearms illegally. After his arraignment, the defendant filed a motion to suppress the evidence allegedly obtained in violation of his Fifth Amendment rights. The trial court granted the motion, suppressing two firearms charged in the indictment, and statements made by Gravens during a discussion with police on July 8, 1994. Gravens later filed a second motion to suppress the evidence, which was rejected by the trial court. The second motion sought the suppression of: (1) opinion testimony from an agent of the Bureau of Alcohol, Tobacco and Firearms concerning the charged firearms which had been suppressed as a result of the first motion; (2) incriminating testimony from Gravens' alleged accomplice; and (3) transcripts of Gravens' guilty plea on charges of burglary in state court. The defendant entered a conditional plea agreement, reserving the right to appeal the denial of the second motion. On October 16, 1996, Gravens was sentenced to 58 months and 18 days imprisonment, a $1,000 fine, and a $50 special assessment. On appeal, the defendant asserts that the trial court improperly denied his second motion to suppress the evidence. We affirm.

## I. BACKGROUND

On October 4, 1983, Jim Beer ("Beer") of Decatur, Indiana, purchased an Ithaca, model 37 Feather Light, 12 gauge shotgun, serial # 371622142, from a Coast to Coast hardware store in Decatur. In approximately 1984, Beer obtained a .22 caliber semiautomatic Remington rifle.

In mid-March, 1994, Gravens contacted Chief Deputy William Crone ("Crone") of the Adams County, Indiana, Sheriff's Department in an effort to aid his girlfriend who was incarcerated in the Adams County jail. Gravens hoped to secure her release by helping the police make "several prominent drug arrests." Apparently, Gravens was interested in marrying his girlfriend and wanted to help speed up her release. Gravens told Crone he would contact him after he had made the appropriate arrangements, but he never did.

At approximately 12:20 a.m. on April 28, 1994, Beer reported that his residence had been burglarized and that several firearms and ammunition had been taken. The police report listed two of the firearms taken as a "12 gage [sic] Pump possibly an Ethica [sic]"

and a ".22 semi-automatic riffle [sic] (possibly a remmington [sic] )[.]"

On May 2, 1994, Gravens was arrested in Van Wert County, Ohio, for driving under the influence of alcohol. The defendant was placed into custody at the Paulding County, Ohio, jail. The Van Wert Sheriff's Department notified Detective Eric Meyer of the Decatur Police Department of Gravens' arrest and reported that an inventory search of his vehicle had uncovered a trash bag containing ammunition, gun cases, magazine clips and a purchase receipt in the name of "James Beer." Meyer drove to Ohio, photographed the vehicle and its contents, and seized the evidence. Also, on May 2, 1994, Beer's insurance company wrote a subrogation letter addressed to the Decatur Police Department relating to the property stolen from Beer's residence. The letter described two of the firearms stolen as a "12g. shotgun pump Ithica [sic]" and a "22 semi-auto rifle Remington." The letter confirmed that the 12 gauge had been purchased at the Decatur Coast to Coast hardware store.

Crone learned that the defendant was in custody in Ohio. On May 3, 1994, Crone, along with Detective Robert Noack ("Noack"), drove to Ohio to meet with the defendant at the Paulding County jail. The two officers were interested in pursuing the defendant's offer to provide them with evidence relating to drug trafficking in Adams County. Additionally, the officers suspected that the defendant had some involvement with the Beer burglary. Before the interrogation, Crone and Noack advised the defendant of his *Miranda* rights, and the defendant signed a written acknowledgment and waiver of those rights. During the interrogation, Gravens admitted that he had stolen firearms from the Beer residence and, as the district court noted, he "may" have named his alleged accomplice, John Howard ("Howard"). He did not, however, reveal the specific location of the guns other than to suggest that he may have "gotten rid" of one or more of them in Fort Wayne. The defendant then went on to name several individuals in Adams County and Decatur from whom he believed he could purchase narcotics. Although the officers indicated that they could

not help him with his difficulties in Ohio, they told Gravens they would pick him up upon his release from the Paulding County jail.

The defendant Gravens was released on June 8, 1994, and picked up by Crone and Noack. At the time, there was an outstanding warrant for the defendant's arrest in Adams County, but it was decided, in consultation with the prosecutor, that the warrant would be "sat on" or "pulled," meaning that the defendant would not be arrested by local officers. During the return trip to Decatur, it was suggested to the defendant that he should do all in his power to attempt to arrange narcotic purchases from those individuals he had identified during the jail interrogation. Gravens was instructed to contact Noack when the arrangements were finalized.

Crone and Noack met with Gravens periodically during the next several weeks to discuss his progress. For whatever reason, Gravens was unable to produce any evidence relating to drug trafficking in either Decatur or Adams County. Gravens responded by complaining that a member of the Decatur Police Department was "leaking" the fact that he was an informant to the public. This apparently was preventing him from setting up drug deals. After a letter written by the defendant's girlfriend surfaced in the community which revealed Gravens' collusion with the police, Crone and Noack decided that Gravens would no longer be of any use as an informant and that he should be taken into custody on the outstanding warrant at their next meeting.

On July 8, 1994, Crone and Noack arranged to have one of their regular meetings with Gravens. They picked him up in a vacant parking lot, and, as usual, he lay down in the back seat to avoid being noticed. Gravens was not told he was under arrest and was going to jail, nor was he given *Miranda* warnings. Even though the lot was not far from the jail, Crone and Noack drove out of town with Gravens, taking a circuitous route as far afield as fifteen miles away in Monroeville, Indiana. During this twenty or thirty minute detour, Crone and Noack questioned Gravens as to why he was unable to make any narcotics purchases. At some point,

Gravens told the officers that the stolen guns were in Decatur, and later revealed that they were at Howard's residence.

Gravens was then taken to jail, and Deputy Crone and Detective Noack drove to Howard's residence to speak with him. A badly beaten woman answered the door and indicated that Howard had assaulted her. She told the officers that Howard was in the back bedroom of the house, and they proceeded inside, whereupon they found Howard asleep and intoxicated. Crone testified that he saw gun cases protruding from under Howard's bed. After searching under the bed, the officers found the two missing firearms. Howard was arrested on a domestic violence charge and the guns were confiscated.

At the jail, Howard was informed of his *Miranda* rights, which he acknowledged and waived in writing. Crone brought Gravens to the interrogation room to convince Howard to tell the police about the guns and Howard's involvement in the burglary. Howard confessed shortly thereafter.

Gravens was charged in the Adams Circuit Court under a two-count information for burglary and theft. On March 21, 1995, the defendant pleaded guilty to theft, and was sentenced to serve three years at the Indiana Department of Corrections. On November 29, 1995, Gravens was indicted in federal district court for being a convicted felon in possession of or receiving firearms and/or ammunition that has been shipped or transported across state lines, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Sometime after the two firearms had been retrieved from Howard's residence, Special Agent James Cronin ("Cronin") of the Bureau of Alcohol, Tobacco and Firearms ("BATF") was assigned to the Gravens case and obtained a Firearms Transaction Record ("FTR") from Coast to Coast, for the purpose of proving that the Ithaca gun had, in fact, been moved across state lines. The Assistant United States Attorney had asked Cronin to obtain the FTR by facsimile so that it could be attached to the Government's memorandum in opposition to the defendant's motion to suppress evidence. Initially, to locate the record, Cronin provided the Coast to Coast clerk with Beer's name, as well as the make and model type of the firearm. Even with this information, the clerk was nevertheless unable to find the record. When Cronin provided the clerk with the serial number, taken directly off the gun, the clerk was able to retrieve the record. Cronin maintains that had he not been asked to retrieve the record quickly, he could easily have driven to the Coast to Coast personally and conducted a year-by-year search of their records until the purchase records relating to the Ithaca gun were discovered. This method would not have required Cronin to use the serial number.

The defendant's first motion to suppress evidence was filed on January 16, 1996. The trial court granted the motion, suppressing the two firearms charged in the indictment, and statements made by Gravens during his back seat discussion with police on July 8, 1994. The court determined that the statements made by the defendant on July 8 were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). According to the trial court, the Supreme Court has made it plainly clear that "a suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and that the police must explain this right to him before questioning begins." *Davis v. United States*, 512 U.S. 452, 457, 114 S.Ct. 2350, 2354, 129 L.Ed.2d 362 (1994). "In determining whether the accused was subjected to custodial interrogation, a reviewing court should consider the totality of the circumstances. The accused's freedom to leave the scene and the purpose, place and length of interrogation are all relevant factors in making this determination." *United States v. Jones*, 21 F.3d 165, 170 (7th Cir.1994) (internal quotation omitted). The trial judge held:

> [T]he facts support the conclusion that defendant was in custody. He was in the back of the police car and the officers had already decided that he was to be arrested and taken to jail. During the suppression hearing, it was made clear by both officers that they had no intention of allowing defendant to get out of the car and leave. Nor did defendant believe he was free to leave. Apart from being transported in a

moving vehicle, defendant understood the back doors of the police car to be locked since on every one of his other meetings with the officers, he was able to exit the vehicle only after one of the officers got out and opened the back door.

The district court held that there was no doubt that Gravens was in custody and the Government conceded this point.

Similarly, the trial court found that the firearms seized from Howard's house were inadmissibly tainted evidence, and were therefore suppressed. The trial court followed the Supreme Court's reasoning in *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). In *Wong Sun*, the Court held that in order for evidence obtained to be considered fruit of an illegality, the evidence must be obtained by "exploitation" of the illegality. *Id.* Evidence obtained by other means "sufficiently distinguishable to be purged of the primary taint" may not be considered fruit of the illegality. *Id.; see Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). The district court in this case found that the discovery of the two firearms was so closely related to the illegal interrogation of Gravens as to be an "exploitation" of the illegal interrogation. As a result, the firearms are "fruit of the poisonous tree," and therefore were suppressed by the district court.

On April 24, 1996, the defendant filed his second motion to suppress evidence. The trial court rejected the motion on June 28, 1996.

## II. ISSUES

On appeal, Gravens asserts that the district judge's denial of his second motion to suppress was erroneous and should be reversed, arguing that the evidence obtained against him is tainted as "fruit of the poisonous tree." Specifically, the defendant-appellant contends that: (1) the opinion testimony of a BATF agent concerning the interstate transportation of the firearms charged in the indictment should not be admitted because the agent used a serial number lifted directly from the illegally seized Ithaca shotgun to trace the weapon's FTR; and (2) the testimo-

ny of Howard should not be admitted because it was discovered as a direct result of the constitutional violation of the defendant's right to remain silent as well as his right against compelled self-incrimination.

## III. DISCUSSION

### A. Standard of Review

■ In reviewing a district judge's ruling on a motion to suppress, this Court reviews questions of law *de novo* and questions of fact for clear error. *United States v. Liss*, 103 F.3d 617, 620 (7th Cir.1997). A factual finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *Id.* (quotation omitted). "Because the resolution of a motion to suppress is necessarily fact-specific, we give special deference to the district court that heard the testimony and observed the witnesses at the suppression hearing." *United States v. Stribling*, 94 F.3d 321, 323 (7th Cir.1996).

### B. The Opinion Testimony of the BATF Agent Concerning the Movement of the Firearms in Interstate Commerce

■ After Special Agent Cronin was assigned to the Gravens case, his first task was to obtain the FTR from Coast to Coast, for the purpose of establishing that the firearm had, in fact, been moved across state lines. The defendant claims that any testimony from Agent Cronin regarding the interstate shipment of the firearm in this case is inadmissible evidence due to the fact that Cronin traced the firearm record using a serial number lifted from the illegally seized weapon. According to the defendant's brief, "[d]uring the first evidentiary hearing, the Government virtually conceded that the firearms recovered from Howard's residence were discovered and seized as a result of incriminating statements made by Gravens without the benefit of any *Miranda* warnings. Accordingly, the district court ordered the firearms suppressed as fruits of the poisonous tree pursuant to *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)." Thus, the defendant argues that the serial

number from the firearm should not have been used to trace the FTR of the 12 gauge Ithaca shotgun, since the number was "fruit of the poisonous tree."

Agent Cronin did not personally retrieve the transfer record from the Coast to Coast hardware store. When Cronin did contact the hardware store to have the clerk search for the record, he provided the name of the purchaser, the year of the transaction, and a description of the firearm. With this information, however, the clerk was unable to locate the record. It was only after Agent Cronin supplied the serial number that the clerk was able to pull the appropriate record.

The defendant's argument was rejected by the district court on the basis that the FTR would have been discovered even without the use of the tainted serial number. In so doing, the trial court held that "an ATF expert can testify as to the make, model and place of origin of the firearms because those too *would have been inevitably discovered, even without the July 8, 1994 statement.*" (emphasis added). The judge specifically noted that "[w]ith respect to the Ithaca shotgun, the record reflects that apart from defendant's suppressed statements, the Government has the testimony of James Beer (whose house was burglarized), the insurance claim paperwork and the Firearms Transaction Record from Coast to Coast." As for the Remington rifle, "it too was listed on the burglary report and the claim forms submitted to the insurance company. Those documents, like those regarding the Ithaca, existed prior to July 8, 1994."

■ Since the Supreme Court's decision in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), it is well established that the inevitable discovery rule provides exception to the exclusionary rule's requirement that evidence tainted by official wrongdoing be suppressed. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Id.* at 444, 104 S.Ct. at 2509.

Applying the dictates of the Supreme Court, we have consistently held that "[w]hereas the exclusionary rule deprives the prosecution of evidence tainted by official wrongdoing and thereby discourages future improprieties, the inevitable discovery exception to the rule permits the introduction of evidence that eventually would have been located had there been no error...." *United States v. Jones,* 72 F.3d 1324, 1330 (7th Cir.1995). In *Jones,* we held that under the inevitable discovery rule, $299 of genuine currency found during a pat-down search of a defendant should be admitted as evidence in the event that the search was conducted as part of a general search of the defendant's house for the presence of counterfeiting equipment. *Id.* This Court found that if the police had completed their search of the defendant's house without searching the defendant personally, they would have had probable cause to arrest him based on the presence of counterfeiting equipment, and that the subsequent pat-down search conducted at the time of arrest would have produced the currency. *Id.* In *United States v. Cotnam,* 88 F.3d 487 (7th Cir.1996), we held that cash and drugs found prior to an official arrest were admissible under the inevitable discovery rule since the arrest and search incident to arrest were inevitable. "While it would have been preferable for the officers to arrest [the defendant] as soon as they saw the marijuana, i.e., before the subsequent searches, we find that the evidence discovered during these searches would lawfully have been found anyway before the officers left the motel room." *Id.* at 496; *see United States v. Carsello,* 578 F.2d 199, 204 (7th Cir.1978) (fact that investigation would not have occurred but for disclosure of illegally seized items does not necessitate suppression of all evidence discovered in course of investigation as "fruit of the poisonous tree;" evidence sufficiently distinguishable from illegal evidence can be purged of illegal taint and rendered admissible), *cert. denied,* 439 U.S. 979, 99 S.Ct. 565, 58 L.Ed.2d 650 (1978).

■ In the *Jones* opinion, this Court addresses an important corollary of the inevitable discovery rule. When the Government relies on the inevitable discovery rule, it

bears the burden of proving, by a preponderance of the evidence, that it would have been able to uncover the challenged evidence through lawful means. *Jones*, 72 F.3d at 1334 (citing *Nix*, 467 U.S. at 444, 104 S.Ct. at 2509). The trial court found that in this circumstance, the evidentiary standard had been met, and we agree. Agent Cronin knew, without the help of the serial number, that the missing firearms were a 12 gauge Ithaca shotgun and a .22 caliber Remington rifle. He also knew the date that the shotgun had been purchased at this particular hardware store. Additionally, Beer, the victim of the defendant's burglary, was personally available to testify concerning the make and manufacturer of the firearms. Beer had stated on April 28, 1994, to the investigating officers that an Ithaca 12 gauge shotgun and a Remington .22 caliber rifle were missing. Beer had also submitted an insurance claim that identified two of the stolen firearms as an Ithaca 12 gauge shotgun and a .22 caliber Remington semiautomatic rifle. This evidence existed prior to July 8, 1994, the date of the disputed interrogation of Gravens that ultimately led to the illegal seizure of the firearms and the appropriation of the serial number.

At the evidentiary hearing, Cronin testified that he had been asked by the Assistant United States Attorney to obtain the transfer record by facsimile so that it could be attached to the Government's memorandum in opposition to the defendant's motion to suppress evidence. Cronin also testified that given more time, he could have driven to Coast to Coast himself and conducted a year-by-year search for the record. The FTR existed in Coast to Coast's filing system and, with sufficient time and effort, he inevitably would have discovered it by lawful means.

We are convinced that the facts support the Government's assertion that, given less exigent circumstances, Agent Cronin easily and inevitably would have discovered the FTR without the taint of the illegal weapons seizure. Although the inevitable discovery rule is not an exception to be invoked casually, Agent Cronin's testimony at the evidentiary hearing meets the sufficiency test to demonstrate by a preponderance of the evidence that the Firearms Transaction Record could have been found by means other than the use of the serial number.[1]

## C. The Testimony of Howard

■ Similarly, the defendant argues that the testimony of Howard should be suppressed because such testimony is derived from "fruit of the poisonous tree." As discussed above, the district court found that the statements which Gravens made to Officers Noack and Crone on July 8, 1994, were not voluntary. The court noted that since Gravens' statements were involuntary, they could only be used for purposes of impeachment and that evidence derived from the statements was "fruit of the poisonous tree."

Recall that after Gravens was apprehended by police on July 8, 1994, he was questioned by Noack and Crone while riding in the back of the police car. During the interrogation, Gravens informed Noack and Crone that Howard was involved in the burglary and that two firearms taken in the burglary could be found in Howard's house. The officers dropped Gravens off at jail and then drove to Howard's house to question him about the burglary. The officers found Howard asleep and intoxicated. After noticing the stolen guns beneath his bed, Howard was taken to jail, where he was informed of his *Miranda* rights. After some prodding from Gravens, Howard confessed to the burglary.

The defendant claims that Howard's confession and testimony is not admissible because it is fruit of the illegal interrogation that took place in the back of the police car. The defendant argues that Howard's testimony was discovered as an immediate and direct result of the illegal interrogation in the back of the police car on July 8.

While the trial court fully accepted the defendant's reasoning on this point, it additionally found that the police had learned

---

1. Moreover, with respect to both firearms, the defendant has conceded that there is no evidence that either Ithaca shotguns or Remington rifles have ever been manufactured in the State of Indiana.

about Howard's alleged involvement in the burglary of Beer's residence from the defendant on May 3, 1994, during the time when he was being interrogated at the Paulding County jail. At this time, Gravens had been properly Mirandized and, therefore, his statements were not subject to the taint that existed during the July 8 interrogation. In fact, the May 3 statement took place more than two months prior to the tainted interrogation. The trial judge found that from the time of the May 3 interrogation, the eventual interview with Howard was a logical investigative step. The trial court held that "[a]lthough Howard was not interviewed until after the statements made by defendant on July 8, 1994, this does not alter the fact that the government had an *untainted and independent source* (defendant's May 3, 1994 statements at the Paulding County jail) that Howard was involved." (emphasis added).

■ In so holding, the trial court embraced the Supreme Court's reasoning in *Nix*: "[t]he independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation." 467 U.S. at 443, 104 S.Ct. at 2508. Similar to the inevitable discovery rule, the independent source doctrine provides that "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced *by putting the police in the same, not a worse, position than they would have been in if no police error or misconduct had occurred.*" *Id.*, at 443, 104 S.Ct. at 2509. (emphasis added). "When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation." *Id.* This Court has often held that independently discovered and untainted evidence will be admitted in certain circumstances as an exception to the exclusionary rule. In *United States v. Markling*, 7 F.3d 1309, 1317 (7th Cir.1993), we held that the fact that an application for a search warrant contained information obtained through unlawful entry did not perforce indicate that improper information "affected" the magistrate's decision to issue a warrant and thus vitiate applicability

of the independent source doctrine. Rather, the warrant was lawful and the independent source doctrine applied where the application contained probable cause apart from the improper information. *Id.*; *see also United States v. Hartmann*, 958 F.2d 774, 792 (7th Cir.1992) (independent source doctrine allows admission of evidence that had been obtained from defendant while he was cooperating with the Government before he breached his agreement to cooperate, even if the Government violated an alleged agreement to confer immunity on defendant; the Government demonstrated that the evidence would have been discovered through sources independent of defendant's cooperation).

In this case, the Government demonstrated that the evidence in question was obtained from a source independent of Gravens' tainted July 8 confession. On May 3, Gravens admitted to Crone and Noack that he had stolen firearms from Beer's residence, and at that time, he implicated Howard as his accomplice. The police had probable cause to arrest Gravens at this point for the burglary of Beer's home. They also had reasonable suspicion to question Howard about the burglary. However, after speaking with prosecutors, the officers decided to use Gravens as a drug informant. Naturally, the officers delayed their interview of Howard until after the defendant had completed his service as a drug informant, but it was inevitable, even without defendant's July 8 statement, that Howard eventually would be interviewed concerning the Beer burglary. We hold that the Government had untainted and independent evidence that Howard was involved in the burglary, and that this evidence would have been pursued as part of a standard criminal investigation. The independent nature of the source kept Howard's testimony free of taint as "fruit of the poisonous tree."

The defendant raises several concerns regarding the use of the May 3 statement. Initially, the defendant argues that he did not affirmatively mention that Howard was an accomplice during the May 3 interrogation in Paulding County. In fact, the district court specifically mentioned in its Memorandum of Decision and Order, dated March 13, 1996, the fact that the defendant "*may* have

named his accomplice, John Howard," on May 3 at the Paulding County jail. (emphasis added). Nonetheless, the trial judge, after careful examination of the hearing record, ultimately determined that the weight of evidence pointed to the fact that Howard's name had been mentioned during the May 3 interrogation.

> Upon further review of the transcript of the evidentiary hearing of January 20, 1996, it is *clear* to the Court that *the preponderance of the evidence shows that defendant did in fact mention his accomplice during the initial question* [sic] *at the Ohio jail.* While both Noack and Crone testified that they "thought" or "believed" that Howard's name was mentioned during the first interview, on direct questioning by the Court, Noack testified that Howard was mentioned during the first interview. Defendant, while testifying that he did not tell them the locations of the firearms during that interview, *did not indicate that he had not mentioned Howard as an accomplice.* The preponderance of the evidence therefore is that *defendant told the officers about Howard's complicity during the first interview at the Paulding County jail, after defendant had been given his Miranda warnings.*

(emphasis added).

After an analysis of the record, this Court holds that a preponderance of the evidence supports the fact that Howard's name was in fact mentioned by the defendant during the interrogation at the Paulding County jail. Detective Noack was questioned carefully on this issue, and his answers were unequivocal: "Q. 'What did [Gravens] reveal to you [during the May 3 interrogation] regarding Mr. Howard?' A. 'That John was with him.' Q. 'That Mr. Howard was with him at the time he committed the burglary?' A. 'That's correct.'" Crone was asked the same question, to which he responded that he thought that Gravens had mentioned Howard's name. Crone and Noack therefore had an independent and untainted confession from the defendant sufficient to warrant the criminal investigation of Howard.

The defendant also argues that the time gap between the May 3 interrogation and the tainted July 8 interrogation proves that the police only learned about Howard's involvement on July 8. Otherwise, the defendant argues, the police would have interviewed Howard earlier. On the contrary, we believe the two month time lag between the May 3 discovery of Howard's involvement and the July 8 visit to Howard's house is only proper in light of the Government's desire to proceed with its narcotics investigation using Gravens as an informant. As the letter from Gravens' girlfriend suggests, during the summer of 1994, the Decatur criminal community was highly suspicious of Gravens' activities, and a police interview concerning the Beer burglary in which Gravens was noted as a key suspect would only have made his task of attracting narcotics sales more difficult.

Finally, the defendant claims that but for Gravens' prodding, Howard would not have confessed to the burglary after he had been brought to the jail. This argument is plainly irrelevant. Gravens had already confessed that he and Howard had committed the burglary during the May 3 interrogation. No one can be certain whether or not Gravens' prodding was instrumental in obtaining the similar confession from Howard. Such conjecture is pure speculation at best.

■ On this second issue, we hold that the Government learned of Howard's alleged involvement in the burglary of Beer's residence during the May 3 jailhouse interrogation. Despite the tainted nature of the July 8 interrogation, we are of the opinion that the evidence of Howard's involvement in the burglary should not be suppressed as it was obtained from a source independent of the illegal conduct on July 8. It would be proper for us to reverse the district court only if we found its reasoning "clearly erroneous." As stated previously in this Court, the district court's factual finding should be overturned only if that finding "strike[s] us as wrong with the force of a five-week old, unrefrigerated dead fish." *Parts & Elec. Motors v. Sterling Elec., Inc.,* 866 F.2d 228, 233 (7th Cir.1988). This Court believes firmly that no error has been made here.

### IV. CONCLUSION

We have no doubt that the trial court's ruling on these two issues was appropriate. The Government had in its possession, prior to the illegal interrogation of July 8, 1994, information that conclusively established the make and date of acquisition of the stolen firearms. The expert witness, a BATF agent could provide his opinion regarding whether the firearms were made in the State of Indiana or must have moved in interstate commerce to reach Indiana. The FTR for the Ithaca shotgun could easily have been traced by the witness through a careful but uncomplicated year-to-year search of the firearms vendor's records. Therefore, the inevitable discovery rule applies, and the district court properly determined that the agent's expert testimony should not be suppressed.

Similarly, the Government learned about Howard's involvement in the burglary of Beer's residence from the defendant on May 3, 1994. This revelation took place two months prior to the illegal interrogation on July 8. Since this earlier statement is an adequate independent source of evidence linking Howard to the crime, Howard's subsequent statements concerning the crime should not be suppressed, despite the two month delay between the defendant's statement on May 3 and the arrest of Howard on July 8. The police had every right to ultimately interview Howard; the delay was merely a reasonable time allowance for the defendant to complete his service as a drug informant.

AFFIRMED.