**UNITED STATES of America, Plaintiff,**

v.

**Jennifer Joan WARREN, Russell Roy Rhodes, Asabi M. Cade, Tanglyan Marie Leonard, Katherine Joann Morris and Lesa Renee Morris, Defendants.**

**No. 96–CR–181.**

United States District Court,
E.D. Wisconsin.

March 10, 1998.

Eric J. Klumb, Assistant U.S. Attorney, for plaintiff.

Michael Fitzgerald, Fitzgerald & Strang, Milwaukee, WI, for defendant Tanglyman Marie Leonard.

## DECISION AND ORDER

CURRAN, District Judge.

Tanglyan Marie Leonard is charged with conspiring to distribute and with possessing with the intent to distribute in excess of 100 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1) & 846 and with possessing with intent to distribute approximately 23.1 kilograms of marijuana in violation of 21 U.S.C. § 841(a)(1). After being arraigned and pleading not guilty, Leonard moved to suppress all evidence seized from her luggage at General Mitchell International Airport in Milwaukee, Wisconsin by officers of the Milwaukee County Sheriff's Department Drug Interdiction Unit as well as any statements she made to law enforcement officers. *See* Federal Rule of Criminal Procedure 12(b). Leonard contends that the search of her luggage was carried out by the Sheriff's deputies without a warrant, probable cause, or consent in violation of her Fourth Amendment rights.

## I. *PROCEEDINGS BEFORE MAGISTRATE JUDGE*

### A. INITIAL HEARING

Pretrial motions were referred to Magistrate Judge Callahan who held an evidentiary hearing on the motion to suppress on December 11, 1996. During this hearing; arresting officer Carlton Moore, a detective with the Milwaukee County Sheriff Department's Narcotics Interdiction Unit, testified that on September 6, 1996, he observed a woman who had arrived on a "red eye" flight from Los Angeles (Midwest Express flight # 976) who appeared to be nervous and was looking around suspiciously.[1] As luck would have it, the woman (later identified as Defendant

---

1. Although Moore's testimony was found not credible and has been disregarded, the testimony of Moore's partner, Deputy Dennis Konkel, corroborated Moore's rendition of these historical facts.

Asabi Cade) left her ticket on her waiting room seat when she went to the restroom. Moore took the ticket to the check-in counter for safe keeping after reading the ticket to determine how the woman had paid for it (through a travel agent) and where she was going (Cleveland on Skyway Airlines flight # 180).

Moore regarded these facts as suspicious, so he proceeded to the area where he could surveil the baggage being unloaded from the Los Angeles flight. There he found that at least thirteen bags from the Los Angeles flight had been loaded onto a conveyor vehicle for transfer to a connecting flight to Cleveland. Moore noted that many of the bags were black. After palpating them, he found that all the bags were heavy and solid. Most importantly, he said that the smell of marijuana emanating from the bags was so strong that it made his eyes water. His partner, Deputy Dennis Konkel, testified that he also observed the bags on the conveyor and detected a "faint" smell of marijuana. The officers then summoned Deputy Susan Hanson and her drug detection dog, Flea.

Hanson, who was off duty, believes that she was paged at home at about 5:50 a.m. and that she reached the airport about half an hour later. Meanwhile, Defendant Leonard and three other women who had aroused Moore's suspicion had been led out of the waiting room, first to another waiting area, then to the Sheriff's office at the airport. Deputy Hanson estimated that the Sheriff's office was a distance of about two blocks from the waiting room. The office is an enclosed room not frequented by the public.

The luggage was brought inside to a baggage room. By the time Hanson and the dog Flea arrived at this room, the connecting flight to Cleveland was in the process of boarding. Before bringing Flea into the room, Deputy Hanson, with the help of airport baggage handlers, placed the thirteen bags destined for Cleveland on the floor. She then "breathed" the bags by standing on them, thereby expelling air and odor. At this point Flea was brought into the room where he proceeded to sniff the wall.[2] After being directed to the bags, the dog finally alerted to a blue tapestry bag which ultimately was found to belong to Leonard's co-defendant Katherine Morris. Deputy Konkel testified that this alert occurred about 7:50 a.m. See Transcript of Proceedings of December 11, 1996, at 112. Moore then directed that all thirteen bags be brought to the Sheriff's office where the four women had been taken. By this time the women and their luggage had missed the Skyway flight # 180 which had departed for Cleveland at about 6:05 a.m.

At the Sheriff's office, Leonard identified two of the thirteen bags as hers.[3] Moore testified that he opened these bags with her consent and found marijuana. Defendant Leonard was then arrested at approximately 8:00 a.m. See Transcript of Proceedings of December 11, 1996, at 112.

Having heard this testimony, the Magistrate Judge found that Deputy Carlton Moore had reasonable suspicion of the presence of marijuana which justified the temporary detention of Leonard's two suitcases and that Leonard subsequently consented to the search of her bags. Therefore, he recommended that the Defendant's motion to suppress be denied.

## B. REHEARINGS

After this initial suppression hearing, Leonard's counsel learned that Deputy Moore was being investigated for misconduct which included conducting illegal searches at

---

**2.** Deputy Hanson explained that Flea must have been overwhelmed by the presence of so much marijuana in the room and might have been alerting on an air current.

**3.** Co-defendants Katherine Morris and Lesa Morris claimed ownership of four of the remaining suitcases. Defendant Asabi Cade identified two bags as hers, but authorities eventually determined that Cade's two pieces of luggage had been transferred to the Cleveland flight which

had departed from the Milwaukee airport. The deputies opened the six bags they believed belonged to the Morrises and to Cade and each bag was found to contain marijuana.

The five remaining bags were set aside. After Flea alerted on those five bags, they were sent to the Sheriff's headquarters in downtown Milwaukee until warrants could be obtained. Ultimately, these five bags were all found to contain illegal drugs.

the airport. After obtaining and reviewing Moore's employment records, the Magistrate Judge held three more evidentiary hearings. Moore invoked his Fifth Amendment rights and did not testify. The defense called additional witnesses who testified that Moore opened pieces of luggage before he summoned Deputy Hanson and Flea, and before he had allegedly obtained the "consent" of the Defendants to open the bags.[4]

On August 21, 1997, the Magistrate Judge reconsidered his prior decision denying Leonard's motion to suppress and recommended that the motion be granted. He found that Deputy Moore was not credible and that Leonard had not validly consented to the search of her luggage. The government attempted to justify the search as inevitable discovery, but the Magistrate Judge ruled that the doctrine of inevitable discovery did not apply under the circumstances of this case. He found that: "[T]he government has not presented any evidence which would allow me to conclude that "Flea" certainly (or even probably) would have "hit" on Ms. Leonard's bags." Recommendation to the Honorable Thomas J. Curran That Tanglyan Marie Leonard's Motion to Suppress Be Granted (issued August 21, 1997) at 70.

The Magistrate Judge went on to explain that:

> Moreover, the Seventh Circuit has clearly stated that what makes a discovery "inevitable" is not probable cause alone, but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search. [*U.S. v.]Brown*, 64 F.3d [1083]at 1085 [7th Cir. 1995]. Stated another way, in order for the doctrine of inevitable discovery to be applicable, the government must be able to demonstrate that it already had probable cause and that, therefore, discov-

ery of the evidence by legal means was inevitable. Here the government did not have probable cause prior to Detective Moore's illegal search. Nor did it have probable cause (based on legally obtained evidence) prior to Detective Moore's opening Ms. Leonard's bag in the Sheriff's Office.

> The government acknowledges that the time of the "second" search of Ms. Leonard's baggage, (i.e., the search in the Sheriff's Office) it had not yet **legally** acquired probable cause to search her luggage. It seems to argue that, given enough time, it would have inevitably been able to develop probable cause to search Ms. Leonard's luggage. In this respect the government seems to be arguing for expansion of the inevitable discovery doctrine to the "inevitable development of probable cause" doctrine. The inevitable discovery doctrine does not stretch that far. But, even if it did, and for the reasons expressed above, the government has not persuaded me that development of probable cause to search Ms. Leonard's luggage was, in any event, inevitable.

*Id.* at 71–72.

## II. DISTRICT COURT APPEAL

Appealing to this court, the government filed timely objections to the Magistrate Judge's recommendation reiterating the argument that the marijuana in Leonard's suitcases would inevitably have been discovered by the dog Flea. After the objections were briefed, this court held an evidentiary hearing during which the government attempted to bolster its inevitable discovery argument by presenting evidence of Flea's ability to detect the presence of marijuana in a suitcase. At the conclusion of this hearing, the

---

4. For example, Daniel Janusz, a baggage handler for Midwest Express who was also a member of the 128th Air Refueling Wing as well as a part time college student, testified that he had been alerted about possible drugs in suitcases aboard the Midwest Express flight from Los Angeles before the plane landed at Mitchell Airport. He unloaded the bags from the plane and, at the direction of the deputies, brought them to a baggage room where two sheriff's deputies and a counter supervisor waited. Janusz identified one

deputy as a person resembling Moore and the other as Susan Hanson, the dog handler. He said that both deputies then proceeded to open several of the bags. *See* Transcript of Proceedings of May 13, 1997, at 47–60.

The Magistrate Judge made no findings as to the truth of Janusz's testimony and he was not called to testify before the district court. He appears to be a disinterested witness and his testimony was not impeached.

court found that Flea "does possess the capabilities to alert on objects that contain marijuana." However, the court also finds that the reliability of Flea is problematic. The testimony revealed that whenever Flea is brought to a scene, the dog alerts to a suspicious container—usually after some direction or coaching. After a warrant relying, in part, on the reliability of Flea, is issued by a judicial officer, controlled substances may or may not be found in the container. If no drugs are found, Deputy Hanson does not record a false positive alert, but notes that the dog must have smelled the residual odor of drugs which must have been present at some time in the past. Thus, Flea is credited with 100% accuracy by Deputy Hanson.

In this case, Flea alerted on one of Defendant Katherine Morris's bags and on the five bags which did not belong to the four women who were being detained. Flea never alerted on Defendant Leonard's bags. Flea's handler, Deputy Hanson, testified that, in her opinion, Flea would eventually have alerted on Leonard's bags. This evidence, however, is not persuasive. The salient fact is that, although Flea had the opportunity to alert on Leonard's bags, he did not.[5]

The parties do not dispute Magistrate Judge Callahan's finding that Deputy Moore's testimony was not credible. Therefore, this court has disregarded his testimony. The parties also agree that Leonard did not give valid consent to the search of her bags and that, at no time prior to the opening of the bags, did the deputies have probable cause to seek a warrant to conduct a search.

Having reviewed the remainder of this record de novo, Cf. Ornelas v. United States, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), the court also finds that:

1. Deputy Moore's illegal search of luggage which was being transferred from a Midwest Express flight originating in Los Angeles to a Skyway Airlines flight departing for Cleveland caused him to summon Deputy Hanson and her drug detecting dog Flea. Hanson was off duty and at home at the time of the call.

2. Defendant Leonard and her bags were detained and diverted for over half an hour which caused them to miss the flight to Cleveland. At that point they missed the connecting flight, both Leonard and her bag had been "seized." The heretofore consensual stop of Leonard and the observation of her luggage had ripened into a Terry-type investigative detention. After the Cleveland flight's departure, Leonard and her bags continued to be detained for about one and one half hours while the canine investigation was carried out prior to the discovery of controlled substances in Leonard's suitcase and her subsequent arrest.

3. Defendant Leonard was detained in the Sheriff's airport office which is in an enclosed room not frequented by the public, at a distance of approximately two city blocks from the Midwest Express waiting room where the Sheriff's deputies had first encountered her.

### III. *DISCUSSION AND DECISION*

As noted above, the government concedes that at no time prior to the discovery of marijuana in Leonard's bags did the deputies have probable cause to search. In general, evidence obtained without a warrant supported by probable cause must be excluded from a trial. See generally Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). However, in this case the government believes that the evidence need not be suppressed because it fits within the "inevitable discovery exception" to the exclusionary rule. Recently, the Court of Appeals for the Seventh Circuit, explained this exception as follows:

Since the Supreme Court's decision in Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), it is well

---

5. Deputy Hanson testified that, after going through the arduous procedure of laying out the thirteen bags and "breathing" them, she terminated the inspection after Flea alerted on only one bag, that of Defendant Katherine Morris. She explained that the other women had consented to the search of their bags, so she saw no reason to continue. However, this defective "consent" was not obtained until after the bags were transferred from the scene of the canine inspection to the Sheriff's security office. Therefore, Hanson's explanation is unsatisfactory.

established that the inevitable discovery rule provides exception to the exclusionary rule's requirement that evidence tainted by official wrongdoing be suppressed. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Id.* at 444, 104 S.Ct. at 2509.

Applying the dictates of the Supreme Court, we have consistently held that "[w]hereas the exclusionary rule deprives the prosecution of evidence tainted by official wrongdoing and thereby discourages future improprieties, the inevitable discovery exception to the rule permits the introduction of evidence that eventually would have been located had there been no ·error...." *United States v. Jones,* 72 F.3d 1324, 1330 (7th Cir.1995). In *Jones,* we held that under the inevitable discovery rule, $ 299 of genuine currency found during a· pat-down search of a defendant should be admitted as evidence in the event that the search was conducted as part of a general search of the defendant's house for the presence of counterfeiting equipment. *Id.* This Court found that if the police had completed their search of the defendant's house without searching the defendant personally, they would have had probable cause to arrest him based on the presence of counterfeiting equipment, and that the subsequent pat-down search conducted at the time of arrest would have produced the currency. *Id.* In *United States v. Cotnam,* 88 F.3d 487 (7th Cir. 1996), we held that cash and drugs found prior to an official arrest were admissible under the inevitable discovery rule since the arrest and search incident to arrest were inevitable. "While it would have been preferable for the officers to arrest [the defendant] as soon as they saw the marijuana, i.e., before the subsequent searches, we find that the evidence discovered during these searches would lawfully have been found anyway before the officers left the motel room." *Id.* at 496; *see United States v. Carsello,* 578 F.2d 199,

204 (7th Cir.1978) (fact that investigation would not have occurred but for disclosure of illegally seized items does not necessitate suppression of all evidence discovered in course of investigation as "fruit of the poisonous tree;" evidence sufficiently distinguishable from illegal evidence can be purged of illegal taint and rendered admissible), *cert. denied,* 439 U.S. 979, 99 S.Ct. 565, 58 L.Ed.2d 650 (1978).

*United States v. Gravens,* 129 F.3d 974, 979 (7th Cir.1997), *petition for cert. filed,* (February 19, 1998) (No. 97–8039).

## A. PROBABLE CAUSE

■ The government maintains that, if given enough time, Flea would inevitably have alerted on Defendant Leonard's bags thereby establishing probable cause to support an application for a search warrant. *See United States v. Stone,* 866 F.2d 359, 364 (10th Cir.1989) (noting that trained dog's alerting to presence of drugs provides probable cause for search). The Defendant points out that no independent investigation had been initiated prior to Moore's illegal search and that, therefore, discovery of the marijuana was not inevitable. However, the Seventh Circuit's recent formulations of the test for inevitable discovery do not explicitly require that the government be actively pursuing a substantial alternate line of investigation at the time of the constitutional violation. *See, e.g., United States v. Gravens,* 129 F.3d 974, 979–80 (7th Cir.1997), *petition for cert. filed,* (February 19, 1998) (No. 97–8039); *United States v. Jones,* 72 F.3d 1324, 1329–34 (7th Cir.1995); *United States v. Fialk,* 5 F.3d 250, 252 (7th Cir.1993). The Tenth Circuit recently ruled that: "[T]he inevitable discovery exception applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct." *United States v. Larsen,* 127 F.3d 984, 986 (10th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1105, 140 L.Ed.2d 159. *But see United States v. Conner,* 127 F.3d 663, 667 (8th Cir.1997) (government must prove that it was actively pursuing a substantial, alter-

nate line of investigation at the time of the police misconduct).

■ As discussed above, the court is not persuaded by the testimony it heard that Flea was reasonably certain to alert on Defendant Leonard's bags thereby establishing probable cause. But, even if the dog was totally reliable, the Seventh Circuit has explained that probable cause, alone, does not bring evidence within the inevitable discovery exception:

As for inevitable discovery: what makes a discovery "inevitable" is not probable cause alone, as the district judge thought, but probable cause plus a chain of events that would have led to a warrant (or another justification) independent of the search. Otherwise the requirement of a warrant for a residential entry will never be enforced by the exclusionary rule. A warrant requirement matters only when the police have probable cause, because otherwise they can't get one. (Under the second clause of the fourth amendment, "no Warrants shall issue but upon probable cause".) To say that a warrant is required for a search is to say that the police must get judicial approval before acting. Yet if probable cause means that discovery is inevitable, then the prior-approval requirement has been nullified. An argument can be made that probable cause is enough to make a daylight search reasonable, that the second clause of the fourth amendment disfavors warrants, and that those "who have viewed the fourth amendment primarily as a requirement that searches be covered by warrants, have stood the amendment on its head." Telford Taylor, Two Studies in Constitutional Interpretation 46–47 (1969). *See also* Akhil Reed Amar, Fourth Amendment First Principles, 107 Har.L.Rev. 757, 762–70, 801–11 (1994). But this is not the Supreme Court's current understanding. *See Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), *overruling United States v. Rabinowitz,* 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950). Although some language in *United States v. Buchanan,* 910 F.2d 1571 (7th Cir.1990), can be read to say that probable cause alone makes discovery under a warrant "inevitable," that language was a response to the parties' arguments and does not enlarge the inevitable-discovery doctrine. Buchanan's principal argument on appeal was that the warrant had not been supported by probable cause; his willingness to let the case turn on the answer to that question does not imply that for all future cases probable cause establishes inevitable discovery. *See United States v. Johnson,* 22 F.3d 674, 684 (6th Cir.1994).

*United States v. Brown,* 64 F.3d 1083, 1085 (7th Cir.1995). Thus, the court must next examine the chain of events leading to the discovery of Leonard's marijuana.

## B. INDEPENDENT DISCOVERY BY LAWFUL MEANS

■ In order to come within the inevitable discovery exception, the government must prove by a preponderance of the evidence that there was a reasonable probability that the marijuana in Leonard's bags would have been discovered by independent and lawful means in the absence of Deputy Moore's misconduct. *See United States v. Gravens,* 129 F.3d 974, 979–80 (7th Cir.1997), *petition for cert. filed,* (February 19, 1998) (No. 97–8039); *United States v. Jones,* 72 F.3d 1324, 1330 (7th Cir.1995); *United States v. Brown,* 64 F.3d 1083, 1085 (7th Cir.1995). In analyzing this issue, the first question which must be addressed is whether Deputy Hanson and Flea would have been summoned from home by anyone other than Deputy Moore.

■ Deputy Konkel, who did not take part in Deputy Moore's illegal search, was the only other person who could have requested the services of the dog. Although Konkel testified that he observed that the thirteen Cleveland-bound bags were similar in color; that they felt solid and heavy; and that they emanated a "faint" smell of marijuana, there is nothing in the record to prove that the inexperienced Konkel, who had been on the job for only two months, would have summoned Flea on his own initiative without the direction of the senior deputy, Moore.

■ If the inevitable discovery exception is to apply, the causal connection between

evidence sought to be admitted at trial and the illegal search must be so attenuated as to purge the evidence of any taint. *See United States v. Carsello*, 578 F.2d 199, 201–02 (7th Cir.), *cert. denied*, 439 U.S. 979, 99 S.Ct. 565, 58 L.Ed.2d 650 (1978). In this case, there is a direct link between Moore's illegal baggage search and the discovery of the marijuana the government seeks to introduce against Leonard. Because Moore and Konkel were working together to investigate the luggage from Los Angeles, any investigating done by Konkel cannot be sufficiently distinguished from the search conducted by Moore who set the canine investigation in motion after he surreptitiously opened one or more of the bags without probable cause. The same chain of causation ultimately resulted in finding the marijuana in Leonard's bags. The prosecution did not show that this link was appreciably attenuated by intervening circumstances or that the investigation was ever purged of its primary taint.

■ Even if Konkel had initiated an independent investigation, including a canine sniff, the investigative detention would not have been lawful under the instant circumstances. In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the case in which the Supreme Court held that dog sniff tests do not implicate the Fourth Amendment because of the slight degree of intrusiveness, the Court held that detentions of personal property without probable cause must meet the standards set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The Court said that:

6. *Place* involved an investigative detention of carry-on luggage which was seized directly from the owner. In Leonard's case, the government contends that the luggage was in the custody and control of the airlines and that, therefore, the seizure did not interfere with the Defendant's possessory interests. *See United States v. McDonald*, 100 F.3d 1320, 1325–26, (7th Cir.1996.) *cert. denied*, 117 S.Ct. 2423 (1997) (traveler does not enjoy "a reasonable expectation of privacy that the exterior of her luggage would not be felt, handled, or manipulated by others"). However, the government did not establish that the terms of the bailment of the luggage would allow a warrantless, investigatory seizure by law enforcement authorities which would cause the luggage

In sum, we conclude that when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited.

*Id.*, 462 U.S. at 706.[6]

The first prong of the test for a permissible *Terry*-type seizure requires an inquiry into whether the officer's action was justified at its inception, that is, whether the officer had a particularized and objective basis for forming a reasonable suspicion that a piece of luggage contains contraband. *See Terry v. Ohio*, 392 U.S. at 20. The second inquiry is whether the officer's actions during the detention were properly limited in scope. *See Id.*

Konkel's basis for reasonable suspicion—his observations of the color, feel and smell of the luggage—is thin. Because these same characteristics are consistent with "innocent" luggage, they raise only a minimal degree of suspicion. *See, e.g., United States v. Hall*, 978 F.2d 616, 621 (10th Cir.1992). Codefendant Asabi Cade, whose luggage was believed to be among the thirteen Cleveland-bound bags, had been observed acting nervous[7] and watchful, but Konkel reported no such observations about Defendant Leonard. He and Moore merely speculated that she was traveling with Cade. Leonard argues that this suspicion was not particularized as to her two pieces of luggage and the court agrees. In the absence of a compelling interest or emergency, "some quantum of individualized sus-

to miss a connecting flight. Even if a bailee had custody and control, Leonard still retained a privacy interest precluding the opening or significant diversion of her luggage. Moreover, the seizure of the luggage occurred after the luggage was relinquished by Midwest Express and before it had been transferred to the Skyway plane. Therefore, it is unclear who had custody and control over Leonard's luggage when it was seized by the deputies.

7. Courts have viewed subjective observations of "nervousness" with scepticism. *See e.g., United States v. Hall*, 978 F.2d 616, 621 n. 4 (10th Cir.1992).

**1196**

picion is usually a prerequisite to a constitutional search or seizure." *United States v. Martinez–Fuerte,* 428 U.S. 543, 560, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Nothing in the record establishes that Deputy Konkel ever had a particularized and objective basis for suspecting that the two bags claimed by Leonard contained contraband. Thus, the seizure does not meet the first prong of the *Terry* test.[8]

■ As for the second prong, the court finds that the scope of the detention of Leonard and her luggage far exceeded the bounds of *Terry* as it has been interpreted by the courts. In *United States v. Place,* the Supreme Court held that a seizure of carry-on luggage "exceeded the permissible limits of a *Terry*-type investigative stop," when the seizure lasted for ninety minutes.[9] *United States v. Place,* 462 U.S. at 709–10. The Court also said that removal of seized luggage to a nonpublic place could be a factor in finding that a seizure exceeded the bounds of *Terry. See Id.* at 709 n. 9.

In this case, the luggage seizure lasted for approximately two hours. This is a much longer detention than courts have approved. See *United States v. Borys,* 766 F.2d 304, 313 (7th Cir.1985) ("Clearly the seventy-five minute detention involved here, if permissible at all, is at the outer bounds of the Constitution."), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986). In addition, the bags were diverted from their ticketed route as they were being transferred from the Los Angeles flight to the Cleveland-bound flight. They were brought to a nonpublic baggage room, then sent to the Sheriff's office. Most importantly, the bags and Leonard were detained for such a length of time that they missed their connecting flight to Cleveland. Under these circumstances, the court concludes that the length and place of the deten-

tion of the bags and of Leonard exceeded the permissible bounds of a *Terry* investigation. Thus, even if Konkel had initiated an independent investigation which would have led to Flea's alert on Leonard's bag, the investigation would not have been lawful because the detention of Leonard and her luggage did not comport with the Fourth Amendment.

In the face of the egregious conduct by Deputy Moore, the government has been unable to persuade the court by a preponderance of the evidence that the marijuana in Defendant Leonard's suitcase would inevitably have been discovered. The court ultimately concludes that: (1) it is not reasonably certain that the dog Flea could have established probable cause; (2) the discovery of Leonard's marijuana was not independent and attenuated from Moore's illegal search; and (3) the detention of Leonard and her baggage exceeded the time and place bounds of a permissible *Terry* investigation. Consequently, the marijuana and statements made by Leonard were obtained in violation of Leonard's Fourth Amendment rights and must be excluded from trial.

### ORDER

For these reasons, the court ORDERS that Tanglyan Marie Leonard's motion to suppress IS GRANTED.

The government shall inform the court within eleven (11) days of the date of this order what further proceedings must be scheduled for this case.

---

**8.** Particularized suspicion, while required for a *Terry*-type detention, is not required for a canine sniff investigation. *See United States v. Race,* 529 F.2d 12, 14 (1st Cir.1976).

**9.** In *Place,* the Court appeared to favor only brief, momentary seizures, but it declined to mandate a maximum of twenty minutes for a *Terry* stop as recommended in the American Law Institute's Code of Pre-Arraignment Procedure.

*See United States v. Place,* 462 U.S. at 709 & n. 10.

In *United States v. Fiala,* 929 F.2d 285 (7th Cir.1991), the Seventh Circuit found that a seizure of a car followed by a ninety minute wait to summon a drug sniffing dog was reasonable. However, in that case the driver was already under arrest for a traffic violation. *See Id.* at 288.